# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## Appeal No. 23-13678-D

Francisco Lagos Marmol and Fernando
Carlos Van Peborgh,

      Plaintiffs-Appellants,

v.

      District Court Case No.
1:22-cv-20703-RNS

Kalonymus Development
Partners, LLC,

      Defendant-Appellee.

---

**Appeal from the United States District Court for the
Southern District of Florida, Miami Division**

---

## APPELLANT'S PRINCIPAL BRIEF

---

**HOLLAND & KNIGHT LLP**

Jesus E. Cuza
Daniel Mahfood
Annelise Del Rivero
701 Brickell Avenue, Suite 3300
Miami, Florida  33131
Telephone:  (305) 374-8500

**KULA & ASSOCIATES, P.A.**

Elliot B. Kula
11900 Biscayne Blvd. Suite 300
Miami, FL 33181
Telephone: (305) 354-3858

*Marmol v. Kalonymus Development Partners, LLC*
Appeal No. 23-13678-D

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 27-1(a)(9), counsel for Appellants, Francisco Lagos Marmol and Fernando Carlos Van Peborgh, certify that, to the best of their knowledge, the following is a complete list of the persons and entities that have an interest in the outcome of this case:

3667 Poinciana, LLC

Best Peacock Inn, LLC

Colomar, Marta

Cuza, Jesus E.

Del Rivero, Annelise

Diaz Jr., Michael

Diaz, Reus & Targ, LLP

Goodman, Jonathan, U.S. Magistrate Judge

Galbo, Robert S.

Greenberg Traurig, LLP

Holland & Knight LLP

Kalonymus Development Partners, LLC

Kula & Associates, P.A.

Kula, Elliot

Mahfood, Daniel M.

Mandel, Joshua M.

Marmol, Francisco Lagos

C-1 of 2

*Marmol v. Kalonymus Development Partners, LLC*

Appeal No. 23-13678-D

Ojeda, Claudia D.

Poinciana, LLC

RDZ Family, LLC

Rothberg, Barry L.

Scola, Robert N., U.S. District Court Judge

Smith, Andrew K.

Van Peborgh, Fernando

Zeff, Maximilian


*/s/ Jesus E. Cuza*
Jesus E. Cuza

## STATEMENT REGARDING ORAL ARGUMENT

Appellants, Francisco Lagos Marmol and Fernando Carlos Van Peborgh, request oral argument. Although Appellants believe the errors requiring reversal are clearly set forth herein and readily discernible from the record, oral argument will facilitate the Court's understanding of the various issues of law on appeal.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ..........................................................C-1

Statement Regarding Oral Argument ....................................................... i

Table of Citations........................................................................... vi

Statement of Subject-Matter and Appellate Jurisdiction ...........................1

Statement of The Issues ...................................................................2

Statement of the Case......................................................................5

I.    Facts ..............................................................................5

    1.    Facts Relevant to Kalonymus' Repeated Material Breach and Unwillingness to Perform the MPA ....................................5

        A.    The Membership Interest Purchase Agreement and Sellers' Default ............................................5

        B.    Kalonymus Elects its Remedy under Section 8.2, Proceeding to Enforce the MPA and Suing in State Court........6

        C.    Sellers Make a First Attempt to Close in December 2021 ........8

        D.    Sellers Make a Second Attempt to Close in January 2022, But Kalonymus Refuses Unless Sellers Agree to a $750,000 Purchase Price Reduction ...........................8

        E.    Sellers Make a Third Attempt to Close in February 2022; Kalonymus Now Raised its Demands to a $1.15 Million Reduction to the Purchase Price ...............................10

    2.    Facts Relevant to Kalonymus' Lack of Financial Ability to Perform Under the Contract and to Kalonymus' Damages ...............14

        A.    The Structure of the Transaction...............................14

        B.    Kalonymus' Claimed Damages .................................17

### TABLE OF CONTENTS

**Page**

i.     Habibi Did Not Calculate Kalonymus' Damages, but Damages To Other Entities and Individuals that are Not Parties to this Case..................17

ii.    Kalonymus Did Not Suffer Any of the Damages it Claimed.......................................19

     1.    Cost of Debt...........................................20

     2.    Lost Profits (Net Rents).......................21

     3.    Duplicate Expenses .............................22

     4.    Lost Tax Advantages...........................22

     5.    Cost of Equity........................................23

II.   Procedural History ........................................24

   A.   Kalonymus First Files In State Court, Sellers File In Federal Court, The State Court Action Is Removed And The Two Are Consolidated ...........................................24

   B.   Sellers Move For Summary Judgment In Their Affirmative Case And The District Court Erroneously Denies The Motion..................24

   C.   Kalonymus Moves For Summary Judgment, And The District Court Erroneously Grants The Motion. .............................................25

   D.   The Parties Move To Strike Each Other's Experts ............................27

   E.   Following A Non-Jury Trial, The District Court Awards Specific Performance And Damages To Kalonymus Against The Manifest Weight Of The Evidence, Binding Eleventh Circuit Precedent, And Settled Florida Law ...................................28

     i.    Trial ........................................................28

     ii.   District Court's Verdict and Judgment .....................................29

III.   Standards & Scope of Review .......................................32

Summary of the Argument..........................................33

# TABLE OF CONTENTS

**Page**

Argument..................................................................................................36

I.  Kalonymus Is Not Entitled To An Award Of Specific Performance or Damages Because It Did Not Meet Its Burden Of Proof of Establishing its Prima Facie Case.............................................................................36

    A.  A Plaintiff Seeking Specific Performance and Damages for Breach of Contract Must Prove It is Ready, Willing, and Able to Perform the Contract According to its Terms ....................................36

    B.  Kalonymus Was Not Willing to Perform the Contract ......................38

    C.  Kalonymus Was Not Able to Perform the Contract ...........................39

        i.  The Applicable Facts and Law in M&M .................................39

        ii.  Like in M&M, Kalonymus Failed to Show It Had the Ability to Pay the Purchase Price .............................................41

II.  Kalonymus is Not Entitled to An Award of Specific Performance or Damages Because it Failed to Act in Accordance with Section 8.2 of the Agreement and Florida Law and Materially Breached the Agreement............................................................................................45

    A.  Section 8.2 of the MPA and Established Florida Law ........................45

    B.  The Undisputed Facts Show Kalonymus Ignored and Violated Both Section 8.2 and Florida Law and Breached the MPA ...............46

III.  Kalonymus is Not Entitled to Judgment in its Favor or an Award of Damages Because (A) It Did Not Prove Damages and (B) the District Court Ignored Corporate Law and Granted Kalonymus an Impermissible Windfall. ..................................................................49

    A.  Kalonymus Failed to Prove Damages .................................................49

        i.  Kalonymus Failed to Prove that it (and Not Someone Else) Suffered Damages ....................................................................49

        ii.  In Finding These Were Kalonymus' Damages, The District Court Ignored Corporate Law on Legal Separateness ............................................................................50

iv

# TABLE OF CONTENTS

**Page**

iii.    Proffering Evidence Of The Damages Suffered By Third Parties Was Insufficient To Carry Kalonymus' Burden Of Proving Damages. .......................................................................52

B.    The Court Did Not Put Kalonymus In The Position It Would Have Been Had The Deal Closed In October; It Put Kalonymus In A Better Position. ................................................................53

IV.    Even if Kalonymus Had Proven Damages (Which it Did Not) Kalonymus Should Have Not been Awarded Damages Beyond January 2022 Because It Failed to Mitigate Damages ................................................56

Conclusion .............................................................................................57

Certificate of Compliance ...................................................................59

Certificate of Service ...........................................................................59

## <u>TABLE OF CITATIONS</u>

**CASES**                                                                               **Page**

*24 Hr Air Serv., Inc. v. Hosanna Cmty. Baptist Church, Inc.*,
    322 So. 3d 709 (Fla. 3d DCA 2021) .............................................................48

*Air Caledonie Int'l v. AAR Parts Trading, Inc.*,
    315 F. Supp. 2d 1319 (S.D. Fla. 2004) (Altonaga, J.) ............................54, 56

*Asset Mgmt. Holdings, LLC v. Assets Recovery Ctr. Invs. LLC*,
    238 So. 3d 908 (Fla. 2d DCA 2018) ...............................................................49

*Chapman v. Al Transp.*,
    229 F.3d 1012 (11th Cir. 2000) .....................................................................32

*City of Pompano Beach v. Beatty*,
    222 So. 3d 598 (Fla. 4th DCA 2017) ..............................................................42

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ..................................................................................21, 51

*Farman v. Deutsche Bank Nat'l Tr. Co. as Tr. for Long Beach Mortgage*
    *Loan Tr. 2006-05*,
    311 So. 3d 191 (Fla. 2d DCA 2020) ...................................................49, 52, 53

*GPDEV, LLC v. Team Sys. Int'l, LLC*,
    No. 4:18-cv-442, 2021 WL 8015621 (N.D. Fla. Feb. 22, 2021) .......25, 46, 47

*\*Hollywood Mall, Inc. v. Capozzi*,
    545 So. 2d 918 (Fla. 4th DCA 1989) ..............................................................37

*Koplowitz v. Girard*,
    658 So. 2d 1183 (Fla. 4th DCA 1995) ......................................................53, 54

*\*M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni*,
    982 F.3d 1333 (11th Cir. 2020) ..............................................................*passim*

*MCI Worldcom Network Services, Inc. v. Mastec, Inc.*,
    995 So. 2d 221 (Fla. 2008) .......................................................................54,55

*\*Merrill Stevens Dry Dock Co. v. M/V Yeocomico II*,
    329 F.3d 809 (11th Cir. 2003) .........................................................25, 46, 47

## TABLE OF CITATIONS

**CASES**                                                                      **Page**

*Miami Bond & Mortgage Co. v. Bell*,
    133 So. 547 (Fla. 1931) ................................................................36

*Molenda v. Hoechst Celanese Corp.*,
    60 F. Supp. 2d 1294 (S.D. Fla. 1999), aff'd, 212 F.3d 600 (11th Cir. 2000) ........................................................................................52

*Proudfoot Consulting Co. v. Gordon*,
    576 F.3d 1223 (11th Cir. 2009) ..................................................32

*Sys. Components Corp. v. Fla. Dep't of Transp.*,
    14 So. 3d 967 (Fla. 2009) ......................................................56, 57

**UNITED STATES CODE**

Title 28, United States Code, Section 1291 ..............................................1

Title 28, United States Code, Section 1332(a)(2) ....................................1

**RULES**

Rule 4(a)(4)(A)(v), Federal Rules of Appellate Procedure. .....................1

**OTHER AUTHORITIES**

13 *Williston on Contracts* § 39:31 (4th ed. 2013) ................................46

24 *Williston on Contracts* § 64:1 (4th ed. May 2023 update) ....................53, 54, 55

25 *Williston on Contracts* § 67.15 (4th ed. May 2023 update) ..............................37

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of costs, interest, and attorney's fees. Appellants are domiciled in Uruguay (Doc. 168-1 at 215[1] [214:17–20]; *id.* at 258 [257:10–13]), and Appellee is a limited liability company whose sole member is domiciled in California (*id.* at 41 [40:11–12]; *id.* at 40 [39:13–14]).

There is appellate jurisdiction because this is an appeal from a final judgment entered on October 12, 2023 (Doc. 163) and Appellants timely filed a notice of appeal on November 3, 2023 (Doc. 169). *See* 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(4)(A)(v).

---

[1] The page numbers in this brief correspond to the page number that appears in the header generated by the district court's electronic filing system. The bracketed page numbers refer to the trial transcript page.

## STATEMENT OF THE ISSUES

"[A] plaintiff's requirement to have sufficient evidence for a prima facie case can never be a peripheral or distracting issue — it is a core, threshold issue."

-*M&M Realty Partners at Hagen Ranch, LLC*, No. 9:17-cv-811135, 2018 WL 3536273, at *2 (S.D. Fla. July 23, 2018).

"M & M's failure to show it was ready, willing, and able to perform under the contract is fatal to its claims for damages and specific performance under the contract."

-*M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1337 (11th Cir. 2020).

These principles of black-letter law guide this appeal, which brings up for the Court's review a final judgment for specific performance and damages arising out of a failed transaction. The district court granted summary judgment for the buyer on its claim for specific performance, and following a non-jury trial on damages entered a verdict in the buyer's favor. But the outcome of the litigation is contrary to this Court's decision in *M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1337 (11th Cir. 2020), holding on nearly identical facts that the plaintiff-buyer's "failure to show it was ready, willing, and able to perform under the contract is fatal to [the plaintiff-buyer's] claims for damages and specific performance under the contract." On this record, without dispute, there is an absence of any evidence that the buyer was ready, willing, and able to perform. The final judgment cannot stand scrutiny under the *M&M Realty Partners* holding.

While this alone is sufficient to reverse the judgment in full and the Court

need not reach any additional issues, there are several other, independent reasons judgment for the buyer must be reversed and entered instead for the sellers. These additional issues relate to the buyer's own subsequent breach of the agreement at issue, and the buyer's failure to prove it suffered any damages. Alternatively, the buyer also failed to mitigate any damages it did suffer.

**The issues are as follows:**

1.    The district court erred in denying summary judgment to defendants, and instead granting summary judgment to the plaintiff on its entitlement to specific performance and damages, where:

- There was no evidence the plaintiff was "ready, willing, and able" to perform under the contract;[2]

- The evidence showed that after suing to enforce the contract through specific performance, the plaintiff refused to perform and in fact breached the contract;[3]

- The plaintiff failed to prove it suffered any damages, and thus failed to prove an essential element of its contractual claims.[4]

2.    The district court erred in entering a verdict and judgment in plaintiff's

---

[2] *See* ARGUMENT I.

[3] *See* ARGUMENT II.

[4] *See* ARGUMENT III.

favor following a non-jury trial for specific performance and damages where:

- There was no evidence plaintiff was "ready, willing, and able" to perform under the contract;[5]

- The plaintiff failed to prove it suffered any damages and thus failed to prove an essential element of its contractual claims; and the district court also ignored corporate law and awarded plaintiff damages suffered by third parties;[6]

- Alternatively, even if plaintiff *had* proven any damages, it failed to mitigate damages and the court erred by failing to apply the doctrine of avoidable consequences.[7]

---

[5] *See* ARGUMENT I.

[6] *See* ARGUMENT III.

[7] *See* ARGUMENT IV.

## STATEMENT OF THE CASE

### I.    Facts

#### 1.    Facts Relevant to Kalonymus' Repeated Material Breach and Unwillingness to Perform the MPA

##### A.    The Membership Interest Purchase Agreement and Sellers' Default

In June of 2021, Francisco Lagos Marmol, Fernando Van Peborgh and Kalonymus Development Partners, LLC ("Kalonymus") entered into a Membership Interest Purchase Agreement ("MPA") under which Marmol and Van Peborgh ("Sellers") would each sell their 50% ownership interests in Best Peacock Inn, LLC ("Best Peacock") to Kalonymus and/or its assignee for $5,450,000. (Doc 8-1.) Best Peacock owned a Miami rental property which it rents to its tenants. (*Id.* at 1)

The sale was scheduled to close in October of 2021, but in early October Sellers discovered a provision in the property's mortgage that would prevent them from closing until January of 2022. (Docs. 168-1 at 218 [217:13-24]; 168-1 at 262 [261:4–12]; Doc. 159-4 (Trial Ex. F)) Specifically, under certain terms of the promissory note, the mortgage *could **only** be paid off during the first quarter of each year, between January and March*. (*See id*) Sellers did not remember or were not aware of the provision prior to October 2021, but, nonetheless, because of the restriction, Sellers could not close in October 2021. (*See id*) Sellers' default, though unintended, is undisputed.

**B.** **Kalonymus Elects its Remedy under Section 8.2, Proceeding to Enforce the MPA and Suing in State Court**

The MPA, in section 8.2, provided the exclusive remedies available to the "Buyer" in the event of a Sellers default:

> 8.2   In the event of a default by Seller under the terms of this Agreement, Buyer shall have the sole and exclusive remedies of either (i) terminating this Agreement, and receiving the return of its Deposit, whereupon all parties hereto shall be released and relieved from any and all further liability or obligations hereunder; or (ii) proceeding to enforce this Agreement by an action for specific performance, as Buyer shall thereby, without waiving Buyer's right to recover any and all losses, damages, costs and expenses resulting from Seller's default.  Notwithstanding anything to the contrary herein contained, in the event of an intentional willful failure of Seller to perform any matter reasonably within its control or in the event any of the warranties and representations made by Seller herein shall be in any material respect inaccurate or there is an omission of a material fact necessary to make any representation of Seller not misleading in light of the circumstances under which it was made, Buyer shall have any and all remedies available to Buyer under the laws of the State of Florida.

(Doc 8-1 at 20) (emphasis added).

In response to Sellers' October 2021 default, Kalonymus chose option (ii) and elected not to terminate the MPA, but instead to "proceed[] to **enforce this Agreement** by an action for specific performance … without waiving [Buyer's] right to recover… damages… ." (*Id.* (emphasis added)); (Doc. 35-1 ¶ 10; 35-2). Consistent with its election of remedies, on December 20, 2021, Kalonymus sued in state court. (*Id.*) In its first count for specific performance, Kalonymus sought to enforce the MPA pursuant to its terms and specifically under section 8.2, alleging in pertinent part as follows:

- "The Agreement entered into between Buyer and Sellers, as amended, provided that closing was to take place on or before October 8, 2021." (Doc. 35-2 ¶ 28).

- "**At all relevant times, Buyer was prepared to pay the Purchase Price and was otherwise ready, willing and able to perform its**

6

**obligations under the Agreement**." (*Id.* ¶ 29 (emphasis added))

- "By failing to close on the sale of 100% of the Membership Interests pursuant to the schedule set forth in the Agreement, Sellers failed to perform their obligations under the Agreement and thereby breached the Agreement." (*Id.* ¶ 30)

- "Section 8.2 of the Agreement specifically permits Buyer to seek specific performance regarding the conveyance of the Membership Interest." (*Id.* ¶ 31)

- "**Buyer is prepared to pay the Purchase Price and is otherwise ready, willing and able to perform its obligations under the Agreement**." (*Id.* ¶ 32 (emphasis added))

And in its prayer for relief on its count for specific performance, Kalonymus demanded:

> "WHEREFORE, Plaintiff, Kalonymus Development Partners, LLC, demands judgment that Sellers be required to convey the 100% of the Membership Interest in Best Peacock Inn ***pursuant to the terms of the Agreement***, that the closing be set within a reasonable time, that Buyer be awarded its reasonable attorney's fees and costs pursuant to Section 8.3 of the Agreement, and such other and further relief as this Court deems just and proper." (*Id.* at 7) (emphasis added).

Separate and apart from its request for specific performance, and also consistent with section 8.2, Kalonymus asserted claims for breach of contract seeking damages in Counts II and III. (*Id.* at 7–9)[8]

---

[8] A fourth count for a negligent misrepresentation claim was dismissed by the district court on August 28, 2023, as duplicative of Kalonymus' breach-of-contract claims. (Doc. 137).

### C.     Sellers Make a <u>First</u> Attempt to Close in December 2021

On December 21, 2021, **the day after Kalonymus sued**, Sellers informed Kalonymus that they would be ready, willing, and able to close in just 12 days, on January 2, 2022 — *the first possible opportunity when Sellers could do so considering the payoff restriction.* (Doc. 35-1 ¶ 13; Doc. 40 ¶ 8).[9]

### D.     Sellers Make a <u>Second</u> Attempt to Close in January 2022, But Kalonymus Refuses Unless Sellers Agree to a $750,000 Purchase Price Reduction

Sellers attempted to close again in January. (Doc. 35-1 ¶ 15) Sellers signed the closing documents (which had been prepared back in October) on January 4, and on January 5, 2022, their transactional attorney, Lisette Salazar, sent the documents to the buyer's attorney, Stephen Szabo.  (*Id.*; *see also* Doc 83-4)[10] That same day, January 5, 2022, Mr. Szabo responded: "***Lisette, Buyer is ready, willing, and able to close, but only after Sellers satisfactorily address Buyer's demand as set forth in [] its November 12, 2021, letter (attached)***…" (Doc. 159-6 (Trial Ex. I) (emphasis added))

---

[9] **Importantly, Sellers did not ask Kalonymus to waive or withdraw its Counts seeking damages for the October 2021 default.** (Doc. 168-1 at 243–244 [242:21–243:2]; 113 [112:9-14]) This approach was consistent with section 8.2 (which allows the buyer to sue to enforce the agreement through specific performance without waiving its right to damages). Kalonymus did not respond to Sellers' request to close. (*Id.* at 223 [222:3–9]; 245 [244:3–9]; Doc. 159-5 (Trial Ex. H)).

[10] Kalonymus admitted these were the final closing documents. (Doc. 35-1 ¶ 15)

Mr. Szabo was referring to Kalonymus' demand that the Sellers agree to a $750,000 reduction in the purchase price. (Doc. 83-7) Alternatively, Kalonymus demanded $1,000,000 to terminate the agreement. (*Id.*) Thus, and despite its allegation in paragraph 32 of its Complaint that it was "prepared to pay the Purchase Price and is otherwise ready, willing and able to perform its obligations under the Agreement", Kalonymus refused to close unless Sellers agreed to reduce the purchase price by $750,000.[11] (*Id.*; Docs. 35-1 ¶ 16; 40 ¶ 10; 35-3 ¶ 2)

Kalonymus repeatedly admitted, under oath, that it decided not to close under the terms of the MPA and that it would not close unless Sellers agreed to Kalonymus' demands and conditions to closing:

> ***Admitted that Kalonymus rejected [Sellers'] attempt to close on January 5, 2022 on the MIPA's original terms and purchase price***, without consideration of [Sellers'] substantial harm caused to Kalonymus…. (Doc. 40 ¶ 10 (emphasis and alterations added))

> Kalonymus admits that it rejected [Sellers'] attempt to close unless [Sellers] satisfactorily addressed the damages Kalonymus suffered as a result of their breach…. (Doc. 35-1 ¶ 16 (alterations added)).

> …[Kalonymus] was prepared to close in January 2022 ***so long as*** [Sellers] satisfactorily addressed the damages suffered as a result of their breach… Kalonymus' position then and now continues to be that

---

[11] As will be argued, see ARGUMENT II, *infra*, Kalonymus' actions violated section 8.2 in two ways. First, Kalonymus had no right to demand $1,000,000 to terminate the agreement in the event of terminating the agreement. *See* section 8.2(i). Second, section 8.2(ii) allowed Kalonymus to "enforce this Agreement", not demand or impose a change in the Agreement (e.g., a reduced purchase price). In other words, Kalonymus' demands and conditions were in conflict with, and in breach of, the exclusive remedies it had agreed to in section 8.2 of the MPA.

it would be willing to proceed with the transaction *if and when* [Sellers] agreed to compensate it for the damages Kalonymus suffered as a result of the aforementioned breaches. Since [Sellers] refused to do so, Kalonymus did not proceed with closing in January 2022. (Doc. 35-3 ¶ 2) (alterations and emphasis added)

Sellers did not agree to reduce the purchase price by $750,000, as Kalonymus demanded, finding the demand unreasonable and unsupported, given that there had only been a short (roughly 3 month) delay in closing. (Doc. 168-1 at 222 [221: 16–21]; 263 [262: 9-19]) However, Sellers never asked Kalonymus to withdraw its complaint or otherwise waive any right to damages, a fact admitted by Kalonymus' principal, Max Zeff ("Zeff"). (Doc. 168-1 at 113 [112:9-14]) Sellers asked only to close under the terms of the MPA, "without waiving Buyer's right to recover any … damages …" which is exactly what section 8.2 provides. (Doc. 40 ¶ 10 (admitting Sellers attempted to close on the MPA's original terms and purchase price)) Kalonymus refused to withdraw its $750,000 price reduction demand, and the deal did not close in January 2022. (*Id.*)

> **E.     Sellers Make a <u>Third</u> Attempt to Close in February 2022; Kalonymus Now Raised its Demands to a $1.15 Million Reduction to the Purchase Price**

Sellers made a *third* attempt to close. On February 16, 2022, through a letter sent by counsel, Sellers communicated they were prepared to close immediately and asked Kalonymus to pick a date for closing to take place by March 15, 2022 (the

available window under the mortgage payoff restriction). (Doc 8-2)[12]

Kalonymus' sole owner, Zeff, immediately reached out to the lender, Newmark, that had agreed to finance part of the purchase of the transaction in October 2021. (Doc. 159-9 (Trial Ex. L); 168-1 at 129 [128:10–19]).

On February 18, 2022, the lender's representative, Garrett Swanky ("Swanky"), emailed Zeff explaining the difference between the loan terms offered to the borrower in October 2021, and the terms that were current in February 2022. (*Id.*) Per Swanky's email, the interest rate on the loan had increased from 3.35 to 4.10 (a difference of .75 basis points), and the principal amount that would be loaned by the lender had decreased by $223,000 (from $2,539,000 to $2,316,000):

---

[12] Again, Sellers asked only to close and specifically perform under the terms of the MPA and did not ask Kalonymus to withdraw its complaint or otherwise waive any right to damages. (Doc. 8-2; 168-1 at 243–244 [242:21–243:2]; 113 [112:9-14]) Rather, Sellers requested Kalonymus provide (1) an exact calculation of its alleged damages and (2) all documents that supported its alleged damages, so that the Sellers could potentially address those damages. (Doc. 8-2)



(*Id.*). Thus, the change in financing terms between October 2021 (when the transaction was originally supposed to close) and February 2022 (when Sellers were able to close) was **minimal**. (*Id.*) Indeed, Kalonymus' damages expert, Paul Habibi ("Habibi"), confirmed that the actual amount of additional interest that would have been incurred by the borrower had the transaction closed in February 2022 **was only $9,899 per year**—a total of **$98,990** over the 10-year loan term. (Doc. 159-15 (Trial Ex. T); Doc. 77-13 at 15, 23)

Notwithstanding the figures Swanky provided to Zeff on February 18, 2022, on February 22, 2022 (just four days later), Kalonymus responded to Sellers'

February 16 letter representing the damages incurred for increased financing costs

were far greater:

> The difference in the interest rate alone equals roughly $800,000 in additional interest over the loan term. Additionally, due to the increase in the interest rate, Buyer's Debt Service Coverage Ratio has changed and therefore Buyer will be receiving a $500,000 reduction in proceeds. This impact can be calculated one of two ways - as a reduction in the cash on cash return (i.e. how much discount does Buyer need to get to the same cash on cash return it would otherwise have received), or as a time value of money calculation. The more conservative approach would be the time value of money calculation; using 7% results in an reduction of $350,000 over the 10 years.

(Doc. 31 (under seal); Doc. 159-10 (Trial Ex. M) (emphasis added)) So, while the

additional interest over the loan term was $98,990, Kalonymus misrepresented and

demanded $800,000 in additional interest. And while the loan amount was going to

be reduced by only $223,000, Kalonymus misrepresented the reduction would be

$500,000.[13] (*Id.*)

In the February 22 letter Kalonymus then conditioned its willingness to close

on Sellers' agreeing to a reduction of $1,150,000: "… Buyer is willing to accept a

$1,150,000 reduction in purchase price and will proceed with closing on or before

March 15, 2022." (Doc. 40 at ¶ 12; Doc. 35 ¶ 12 (citing to Doc. 31); Doc. 35-1 ¶¶

17-18; Doc. 35-3 ¶¶ 1-4; Doc. 159-10 (Trial Ex. M))

Because Sellers did not agree, the deal did not close in February or March

---

[13] Although Kalonymus had this documentation from the lender disclosing the true amounts of the financing damages, this document was not provided to Sellers together with Kalonymus' February 22, 2022 letter, although Sellers had requested supporting documentation for Kalonymus' alleged damages. (Doc. 8-2)

2022. (Doc. 35 ¶ 13; Doc. 8 ¶¶ 33, 34).

### 2. Facts Relevant to Kalonymus' Lack of Financial Ability to Perform Under the Contract and to Kalonymus' Damages

#### A. The Structure of the Transaction

The MPA provided that the purchaser was Kalonymus (which is 100% owned by Zeff) and/or its assignee. (Doc. 8-1 at 1) However, had the deal closed in October 2021, **Kalonymus was not going to be the buyer at closing** because Kalonymus was going to assign the MPA to two separate entities, 3667 Poinciana, LLC ("3667 Poinciana") and Poinciana LLC ("Poinciana") (together, the "Poinciana Entities").[14] (Doc. 89 at ¶ 65 (citing Doc. 77-11 ¶ 7); Doc. 98-1 at 14 [48:15–49:18]; 17 [58:15–23]; 26 [97:5-10]) These two companies would then acquire ownership of the shares of Best Peacock. *See id.*; *see also* (Doc. 168-1 at 46 [45]); Doc. 149 at 20)

On October 12, 2021, 3667 Poinciana entered into an agreement for a loan to fund part of the purchase price under the MPA (specifically, 50%, or $2,539,000 of the total purchase price). (Doc. 83-3; 159-3 (Trial Ex. E); 159-9 (Trial Ex. L); 168-1 at 130 [129:13–14]) 3667 Poinciana signed the Loan Rate Lock Agreement "For and on behalf of Best Peacock Inn, LLC, a Florida limited liability company (to be acquired at closing)":

---

[14] The owners (i.e., members) of 3667 Poinciana are RDZ Family, LLC (99.99%) and Zeff (.01%). The owner (i.e., member) of Poinciana, LLC is Zeff (100%). Kalonymus is not a member or owner of either of the Poinciana Entities. (Doc. 159-12 (Trial Ex. Q)

> **3667 POINCIANA, LLC**, a Delaware limited liability company,
> for and on behalf of Best Peacock Inn, LLC.
> a Florida limited liability company (to be acquired at closing)
>
> By: _Gregory T. Densen_ (SEAL)
> Name: Gregory T. Densen
> Title: Manager

(Docs. 83-3 at 10; 159-3 at 9) ***Thus, the record is undisputed that the borrower who was going to take out the loan was 3667 Poinciana on behalf of Best Peacock, not Kalonymus***. (Doc. 168-1 at 45 [44:19-23] (Q. "…was Kalonymus going to be the entity that took out the loans? A. No. *The single purpose entity that was taking ownership to the assets was ultimately going to be named in the loan*."); Doc. 77-1 ¶ 8; Doc. 149 at 2 ("The loan documents for the contemplated transaction were thus in the name of one of the single purpose entities on behalf of Best Peacock Inn, which was the entity being purchased and the one which held the real estate – the collateral for the loan.")).

The demonstrative below (Doc. 159-12) summarizes the transaction: (1) the left side reflects the parties to the MPA in June 2021, and (2) the right side shows how the October 2021 closing was structured (other than assigning the MPA, Kalonymus was to play no role at closing or thereafter).



The final component of the transaction was how the remaining 50% of the purchase price not covered by the Newmark loan was going to be funded. The remaining 50% of the purchase price ($2,911,000) was going to be paid in cash. (Doc. 168-1 at 45 [44:10–12] (where Zeff testified that the $5,450,000 purchase of the shares "was going to be paid for through roughly 50 percent debt and 50 percent in cash.")). As to where the cash was going to come from, the *only* evidence in the record is Zeff's testimony at trial that "[a] small portion of the cash was going to come from Kalonymus, but the large majority was going to come from another entity." (*Id.* at 45 [44:13–16]) The "other entity" that was *purportedly* going to provide the majority of the cash was never identified. (*See id.*)

The evidence in the record on how the $5,450,000 purchase price was going

to be paid at the October 2021 closing is summarized below:[15]



### B.    Kalonymus' Claimed Damages

#### i.    Habibi Did Not Calculate Kalonymus' Damages, but Damages To Other Entities and Individuals that are Not Parties to this Case

Kalonymus retained Habibi to quantify its damages. In his Report, Habibi provided a purported damages analysis and concluded "Kalonymus" suffered approximately $1.8 million in damages. (Doc. 77-13 at 11 ¶ 35)[16] But Habibi since

---

[15] How the purchase price was going to be paid is important to the argument, *see* ARGUMENT I, *infra*, because, as required under *M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni* and Florida law, to be "ready, willing, and able" to close, the buyer must be *financially able* to close — in other words, the buyer must show "it has (1) the necessary cash on hand; (2) personal possession of assets and a credit rating that show a reasonable certainty to command the requisite funds; or (3) a binding commitment by a financially able third-party" to provide the necessary funds. 982 F.3d at 1337 (internal quotation marks and alterations omitted).

[16] This amount was supplemented at trial and the amount was updated to $2,673,742 as of September 8, 2023. (Doc. 158-1 at 68 (Trial Ex. 22))

then admitted (repeatedly) that he ***quantified the alleged damages suffered by an assortment of other entities and individuals — none of whom are Kalonymus, and none of whom are parties to this case***:

> Q. So what we learned [today] is that all these damages that you're talking about are damages that some entity or Mr. Zeff personally would have suffered, in your opinion, correct? … we also know that none of these entities are plaintiffs in this case, correct?
>
> A. I know none of these entities are Kalonymus, LLC.
>
> Q. Right. So the entities and Max [Zeff] that suffered the damages that you're referring to, number one, they are not plaintiffs in this case, correct?
>
> A. They are not plaintiffs, correct.
>
> Q. And like you said, they are not Kalonymus, LLC, correct?
>
> A. That's also correct.

(Doc. 98-1 at 32 [145:24–146:22] (alterations added))

Habibi also admitted that he did not distinguish Kalonymus—the plaintiff—from the "various entities or interest within the Zeff family." (*Id.* at 17 [61:2-6]) Instead, Habibi calculated a damages number for, as he put it, "the collection of entities that comprise Max Zeff's investment." (*Id.* at 20 [73:5-8]) Consistent with this, Habibi stated his damages calculation concerned "the investors or entities comprised in total" and he "didn't view it specifically through the lens Kalonymus…" (*Id.* at 18 [62:20–24])

> …I'm not distinguishing Kalonymus, LLC because I'm clearly aware that there were other entities that were set up to take ownership of the

subject property, so it wasn't important to distinguish between Poinciana, LLC, 3667 Poinciana, LLC, Kalonymus LLC, Max Zeff personally, any family entities. It was all one contributor of capital and that's how I viewed it and that's the right way to do it.

(*Id.* at 17–18 [61:23–62:6])

When asked directly, Habibi conceded that he was not really trying to

calculate Kalonymus' damages, but rather the damages suffered by Zeff and/or any

of his companies:

Q. Now, what you did, which is what you were asked to do. You weren't trying to calculate the damages of Kalonymus, LLC. You were trying to determine what harm Max Zeff or any of his entities suffered as a result of not closing in October, 2021, correct?

A. I was asked not to distinguish between Max Zeff, Kalonymus, LLC and the various single purposes entities in the transaction. **I was not asked to make that distinction and I did[n't].**

(*Id.* at 34 [128:24–129:8] (alteration and emphasis added); 37 [138:8-14])

### ii.    Kalonymus Did Not Suffer Any of the Damages it Claimed

Kalonymus claimed it was damaged because, but for the Sellers' breach, the

closing would have taken place in October 2021 and Kalonymus:

1. *Would have enjoyed*, *as a borrower*, the lower interest rates offered in October 2021 under the Rate Lock Agreement with Newmark; ("Cost of Debt")

2. *Would have received* the lost profits (i.e., the net rents) generated from the property owned by Best Peacock since October 2021; ("Lost Profits")

3. *Would not have had to pay* expenses twice; ("Duplicate Expenses")

4. *Would have enjoyed* certain tax advantages; ("Tax Advantages")

5.  *Would not have suffered* a \$1,313,350[17] loss — (so called "Cost of Equity" damages).

(Doc. 168-1 at 153–155 [152:12–154:6]) Each is explained below. [18]

**1.  Cost of Debt**

Kalonymus claims it was damaged because, had Sellers not breached and the deal closed in October 2021, Kalonymus would have been able to enjoy the more favorable interest rate (3.35%) offered by Newmark in October 2021. (Doc. 158-1 at 69 (Trial Ex. 22) (supplementing Doc. 77-13); Doc. 168-1 at 157 [156:14–157:5]) Kalonymus claims those terms would no longer be available to it in any closing by Kalonymus after October 2021. (Doc. 168-1 at 166 [165:13-19]; Doc. 77-13 at 15 ¶ 40) However, the record shows Kalonymus was not a party to any loan transaction. *See* FACTS I.2.A. *supra.* This is undisputed: the signed loan documents show that the entity who entered into the Rate Lock Agreement with Newmark in October 2021 was 3667 Poinciana, not Kalonymus. (Doc. 159-3 at 9; 168-1 at 45 [44:19-23])

---

[17] This is the sum the district court awarded in its Verdict (Doc. 162 at 4).  To reach it, the district court subtracted out the cost of debt and other costs from Habibi's total cost of capital number. (*Id.*; Doc 158-1 at 68 (Trial Ex. 22))

[18] Kalonymus also claimed another category of damages, increased capital costs for other projects by other parties that were originally bundled in a portfolio with the MPA transaction, but the district court rejected these damages, and they are not at issue in this appeal. (Doc. 162 at 4–5)

### 2.  Lost Profits (Net Rents)

Kalonymus claims it was damaged because had Sellers not breached and the deal closed in October 2021, Kalonymus would have collected the net rental income generated by the property owned by Best Peacock. (Doc. 158-1 at 72 (Trial Ex. 22)) But as the facts below show, Kalonymus would not have collected any net rents even if the transaction had closed in October 2021.

First, the rents paid by the tenants of the property are paid to the landlord and property owner, Best Peacock. (Doc. 168-1 at 182 [181:2-6]) Because the transaction involved the purchase of Best Peacock's shares, and not the purchase of Best Peacock's assets, Best Peacock would have continued to own the property and be the landlord and sole party entitled to collect the rents. (*Id.* at 181 [180:23–181:1]) Thus, no entity other than Best Peacock (not even its shareholders) ever had any right to those rents, because the rents are an asset of Best Peacock and belong to Best Peacock, not its shareholders or members.[19] (*Id.* at 182–183 [181:2–182:3])

---

[19] *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) (***"An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets…"*** (citing 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 31 (rev. ed. 1999) (emphasis added)). "The property of the corporation is its property and not that of the shareholders as owners…[E]arnings and profits still in the possession of a corporation belong to the corporation the same as its property generally, and there is nothing due and owing a shareholder as a matter of debt or property until a dividend is declared in an appropriate manner." *Id.*

Moreover, even under the hypothetical that Best Peacock would have elected to make one or more distributions (of which there is no evidence in the record whatsoever), the distribution would not have gone to Kalonymus, because Kalonymus was not going to be an owner (i.e., a member) of Best Peacock had the transaction closed in October 2021. *See* FACTS I.2.A. *supra*. The Poinciana Entities, *not* Kalonymus, would have acquired Best Peacock in October 2021. *Id.*

### 3.  Duplicate Expenses

Kalonymus claims it was damaged because had Sellers not breached and the deal closed in October 2021, Kalonymus would not have been forced to pay certain expenses twice. (Doc. 158-1 at 75 (Trial Ex. 22)) But the record shows Kalonymus never paid any expenses to begin with. As Habibi admitted:

> Q. And we've also covered the duplicate expenses, right -- we just did now -- where there's not -- no evidence that Kalonymus paid any expenses, to begin with, correct?
>
> A. I don't have evidence that Kalonymus, as an entity, made those payments, correct.

(Doc. 168-1 at 192 [191:9-13])

### 4.  Lost Tax Advantages

Kalonymus claims it was damaged because, had Sellers not breached and the deal closed in October 2021, Kalonymus would have enjoyed certain tax benefits and favorable tax treatment. (Doc. 158-1 at 77 (Trial Ex. 22)) But Kalonymus was never going to enjoy any tax benefit, even if the transaction had closed in October

2021: the tax deduction would have been available *only to the individual members of the purchasing entities — i.e., the individual members of the Poinciana Entities — not Kalonymus*. (Doc. 168-1 at 186 [185:13–19] ("Q. And you've already discussed, right, who's the party that would be harmed by the loss of tax depreciation, correct? A. Correct. Q. And you've identified that it's the members. It flows all the way up to the *individuals*, if you will, that are filing the tax returns, correct? *A. Yes.*" (emphasis added))); *see also* 184–185 [183:24–184:24]). [20]

### 5. Cost of Equity

Kalonymus claimed (and the district court awarded) $1,313,350 in additional damages (so-called "cost of equity" damage). *See* n. 17 *supra*. Habibi defines "cost of equity" as "a percentage that investors seek to compensate them for the risks of real estate ownership" (Doc. 168-1 at 153 [152:22–25]) and "represents what an investor could earn on an investment of similar risk." (*Id.* at 205 [204:20-21]) Habibi admitted that the party affected by this "cost of equity" concept is the "party that's making the capital contribution of equity." (*Id.* at 202 [201: 13–14]) **But it is undisputed that was not Kalonymus; here, Kalonymus suffered absolutely no harm.**[21] *See* FACTS I.2.A. *supra*.

---

[20] The individual members of the purchasing entities (here, the Poinciana Entities) were Zeff and whichever unidentified individuals own RDZ Family, LLC. (*Id.*)

[21] How the awarded $1,313,350 compensates Kalonymus for a harm or injury to Kalonymus is both unclear and a mystery. What *is* clear is that the $1,313,350

## II.    Procedural History

### A.    Kalonymus First Files In State Court, Sellers File In Federal Court, The State Court Action Is Removed And The Two Are Consolidated

On December 20, 2021 Kalonymus sued Sellers in state court seeking specific performance and damages for breach of contract. (Doc. 35-2) Sellers attempted to specifically perform and close in December 2021, January 2022, and February 2022, but Kalonymus refused absent a reduction in the purchase price and breached the agreement, so Sellers terminated the Agreement. On March 9, 2022, Sellers also initiated an action in federal court for declaratory judgment to resolve the controversy between the parties as to their respective rights and obligations relating to the MPA. (Doc. 1) Sellers later removed the pending state court action to federal court, and it was transferred and consolidated with the Sellers' declaratory judgment action on April 6, 2022. (Doc. 13) Both actions then proceeded together before the district court.

### B.    Sellers Move For Summary Judgment In Their Affirmative Case And The District Court Erroneously Denies The Motion

On July 29, 2022, Sellers sought summary judgment on their claim for

---

awarded to Kalonymus as "cost of equity damages" doesn't represent an amount Kalonymus was supposed to receive and did not so receive because the deal did not close in October 2021. What is also clear is that the $1,313,350 awarded to Kalonymus in damages is not an amount that Kalonymus had to pay or spend as a result of the deal not closing in October 2021.

declaratory judgment. (Docs. 36; 35) Sellers argued (1) Kalonymus elected to continue with the MPA after Sellers' failure to close in October; (2) with the MPA still in force, Kalonymus breached the MPA in January and February 2022 by refusing to close; and (3) as a result, Sellers validly terminated the MPA and Kalonymus was not entitled to relief for its claims. (*Id*.)

In support, Sellers set forth the undisputed material facts and well-established law in Florida and this Court, which states that (a) when a contract is breached, the contract does not automatically terminate; rather, the nonbreaching party must elect whether to terminate the contract or instead reaffirm and continue to enforce it, while retaining a claim for damages; and (b) if the non-breaching party elects to continue the contract, he remains bound under its terms. *See Merrill Stevens Dry Dock Co. v. M/V Yeocomico II*, 329 F.3d 809, 816 (11th Cir. 2003); *GPDEV, LLC v. Team Sys. Int'l, LLC*, No. 4:18-cv-442, 2021 WL 8015621, at \*3 (N.D. Fla. Feb. 22, 2021). Kalonymus did not contest (nor could it) any of the undisputed facts or the applicable law. (Docs. 41; 40)

On March 15, 2023 the district court erroneously denied Sellers' Motion without addressing the merits, merely stating that the Motion was "superficial." (Doc. 93).

### C.   Kalonymus Moves For Summary Judgment, And The District Court Erroneously Grants The Motion.

On February 9, 2023, Kalonymus sought summary judgment on all of its

25

claims, arguing Sellers breached the MPA by failing to close in October 2021, which damaged Kalonymus. (Doc. 78) Kalonymus relied on Habibi's opinions to prove its damages. (*Id.*; Docs. 79; 77-13) Nowhere in its motion or its statement of facts did Kalonymus cite evidence that it was ready, willing, and able to perform the MPA. (*See id.*; Doc. 79)

Sellers raised several arguments in response. <u>First</u>, Sellers showed that, despite claiming it was ready, willing, and able to perform, Kalonymus repeatedly refused to close (***was unwilling to perform***) unless Sellers reduced the purchase price. (Docs. 84 at 2, 6–7; 83) Sellers also pointed out that, despite moving to enforce and continue with the MPA, Kalonymus breached and repudiated it by conditioning its performance on a price reduction. (*Id.* at 5–8)

<u>Second</u>, Sellers challenged Kalonymus' claimed damages because they were going to be suffered (if at all) by third parties, not Kalonymus. (*Id.* at 8–11)

<u>Third</u>, Sellers showed Kalonymus could have avoided a substantial portion of its alleged damages (i.e., mitigated its damages) simply by closing in January 2022, which it refused to do. (*Id.* at 10–11)

Kalonymus failed to cite to any legal authority to contradict the well-settled principles raised by Sellers. (Doc. 88) On the facts, it admitted that Kalonymus was not going to be the buyer or borrower had the transaction closed in October 2021.

(*Id.*; *see also* Doc. 89 ¶¶ 65, 70) [22]

Sellers then moved to supplement the summary judgment record with Habibi's deposition testimony, where he admitted Kalonymus suffered no damages and the damages it was claiming were incurred by other parties. (Doc. 111) Because Kalonymus' only evidence of damages related to damages suffered by others, Sellers argued Kalonymus had failed to prove the damages element of its claims and was not entitled to judgment in its favor, warranting a denial of Kalonymus' summary judgment motion, and an entry of judgment in Sellers' favor instead. (*Id.* at 9)

On August 28, 2023, the district court entered an order granting Kalonymus summary judgment on its entitlement to specific performance and Sellers' liability for the breach and reserved the question of damages for trial. (Doc. 137) The court never addressed, much less found, that Kalonymus was ready, willing, and able to perform. (*See generally id.*)

### D.    The Parties Move to Strike Each Other's Experts

Sellers moved to exclude Habibi's opinions because his admissions that all of damages he calculated would be suffered by third parties rather than Kalonymus made his opinions irrelevant and unhelpful under *Daubert*. (Doc. 98) Despite conceding that Habibi's opinions were "decidedly problematic" because he

---

[22] Because Kalonymus asserted new arguments in its Reply, Sellers moved for leave to file a sur-reply, enclosing the proposed sur-reply (Doc. 94; 94-1). The district court denied Sellers' motion. (Doc. 96)

"repeatedly lumped multiple entities and parties together," (Doc. 137 at 12–13), the district court erroneously denied Sellers' motion (without analyzing the *Daubert* prongs of helpfulness or reliability or the applicable principles of corporate law) (Doc. 142).

Kalonymus moved to exclude Sellers' rebuttal damages expert, Sheri Fiske Schultz ("Fiske"), arguing Fiske (i) was not a real estate expert qualified to testify about the transaction, and (ii) her opinions were premised on the false assumptions that Kalonymus assigned the MPA and suffered no damages. (Doc. 97) Sellers responded that this transaction was for the purchase of shares of Best Peacock, not real property, and Fiske was qualified to opine on those damages and was the only expert in this case who set forth the *proper* method of calculating damages. (Doc. 107) The district court excluded Fiske because her opinions were contrary to the court's findings and conclusions in its summary judgment order.[23] (Doc. 142)

**E.    Following A Non-Jury Trial, The District Court Awards Specific Performance And Damages To Kalonymus Against The Manifest Weight Of The Evidence, Binding Eleventh Circuit Precedent, And Settled Florida Law**

**i.    Trial**

The case proceeded to a bench trial on September 11 through 12, 2023. At the

---

[23] Because, as will be argued in this appeal, the district court's summary judgment order was erroneous, it was also error for the district court to exclude Fiske's opinions and testimony.

trial, Habibi continued to treat Kalonymus, Zeff, the Poinciana Entities, and others as one entity when calculating damages and, as in his deposition, acknowledged the damages were suffered by parties other than Kalonymus. (Docs. 168-1; 168-2)

Kalonymus could not prove it had the ability to perform the MPA. (*Id.*) The only evidence presented showed that (i) 3667 Poinciana (not Kalonymus) had a commitment from a lender, Newmark, for part of the purchase, and (ii) the remaining 50% of the purchase was purportedly going to be paid for in cash, with few details of where that cash was going to come from. (*Id.*; FACTS I.2.A. *supra*)

During closing arguments, Sellers pointed out this fatal deficiency in Kalonymus' proof and argued that under Florida law and binding Eleventh Circuit precedent as set forth in *M&M*, Kalonymus had failed to prove it was ready, willing, and able to perform the contract and could not prevail on any of its claims. (Doc. 168-2 at 52–60 [51:13–59:13]) Sellers argued Kalonymus had not only failed to meet its burden of proof on its claim for breach of contract damages under *M&M*, but for the same exact reasons, had also failed to meet its burden of proof on its specific performance claim. (*Id.*) Sellers asked the district court to set aside its prior order granting specific performance to Kalonymus and enter judgment for Sellers on all counts. (*Id.*)

### ii.    District Court's Verdict and Judgment

On September 27, 2023, the district court entered a verdict in Kalonymus'

favor. (Doc. 162)

First, the court refused to reconsider its interlocutory summary-judgment ruling that Kalonymus was entitled to specific performance and damages, concluding "Kalonymus has proven all the elements of its breach-of-contract claim, including that it is entitled to specific performance…" *without any discussion of the "ready, willing, and able" requirement or M&M, despite having been raised with the court during closing arguments*. (*Id.* at 6.)

Next, the district court found that, in addition to specific performance, "Kalonymus has established its entitlement to $1,553,245 in damages." (*Id.* at 1) The district court awarded Kalonymus:

- $175,028 for lost profits;
- $50,650 for duplicate expenses;
- $14,217 for lost tax savings; and
- $1,313,350 for "cost of equity"

(*Id.* at 4–6) The district court also awarded $1,033,288 for cost of debt. (*Id.* at 6) This number was not added to the $1,553,245 figure because Sellers agreed (without waiving their right to appeal) to themselves finance the loan for Kalonymus at the rates provided in October 2021 in the Rate Lock Agreement. Had Sellers failed to finance the loan, the damages award of $1,553,245 would have increased by $1,033,288. (*Id.*)

Finally, the district court found Sellers failed to prove their affirmative

30

defenses, including that Kalonymus had failed to mitigate its damages. (*Id.*)

On October 12, 2023, the district court entered judgment consistent with the above and ordered the parties to close on the "sale of the property" by November 27, 2023. (Doc. 163)

### III.    Standards & Scope of Review

1.    This Court reviews the denial of summary judgment to Sellers and the partial summary judgment to Kalonymus on entitlement to specific performance and damages *de novo*, considering only the evidence before the district court at the time it ruled. *See, e.g.*, *Chapman v. Al Transp.*, 229 F.3d 1012, 1023, 1026 (11th Cir. 2000).

2.    The district court's legal conclusions following the bench trial are reviewed *de novo*, while its factual findings are reviewed for clear error. *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009).

## SUMMARY OF THE ARGUMENT

Kalonymus should have never been awarded specific performance or damages in this case, and the district court made two fundamental errors when it (1) denied Sellers' summary judgment motion and instead granted summary judgment to Kalonymus on its entitlement to specific performance and damages; and (2) entered a verdict and judgment for Kalonymus on specific performance and damages following a non-jury trial.

There are four issues of law which will be addressed in this brief that establish the reasons each of the above are errors warranting complete reversal of the district court's judgment:

**1.    Kalonymus Was Not Ready, Willing, and Able to Perform:** Kalonymus is not entitled to an award of specific performance or damages because it did not meet its burden to show it was ready, willing, and able to perform the contract. Kalonymus — by its own admission — was not willing to pay the agreed purchase price; Kalonymus instead demanded a material reduction to close. In addition, Kalonymus failed to prove that it was able (financially able) to specifically perform and close. The uncontested evidence shows Kalonymus was not able to pay the $5,450,000 purchase price under the contract. Under *M&M*, these failures are "fatal" to Kalonymus' claims for specific performance and damages. Thus, the first issue is *whether the district court erred at summary judgment and in its verdict and*

33

*judgment after trial in awarding Kalonymus specific performance and damages,*
*where the undisputed record showed Kalonymus was not ready, willing, or able to*
*perform the contract. See* ARGUMENT I.

**2.** **Kalonymus Materially Breached the Agreement:** Kalonymus is not
entitled to an award of specific performance or damages because it failed to act in
accordance with the exclusive remedies available to it under section 8.2 of the
contract and Florida law. After the Sellers breached the contract in October 2021 by
(unwillingly) failing to close, Kalonymus chose to enforce the contract under section
8.2. Having made that choice, Kalonymus was obligated to then perform under the
terms of the contract — including paying the purchase price agreed to in the contract.
Because Kalonymus refused to do so the second issue is *whether the district court*
*erred at summary judgment in denying Sellers' request for summary judgment and*
*in awarding Kalonymus specific performance and damages where the undisputed*
*record showed Kalonymus refused to follow the contract and instead breached the*
*contract. See* ARGUMENT II.

**3.** **Kalonymus Failed to Prove that It Suffered Damages:**  Even
assuming Kalonymus had met its burden of proving its prima facie claims, and had
not breached the contract, Kalonymus was not entitled to prevail because it failed to
prove the damages element of its breach-of-contract claims. Kalonymus failed to
show *it* suffered damages. But for the district court ignoring well-settled law on

corporate separateness of legal entities, Kalonymus would not have been awarded any damages. Thus, the third issue is *whether the district court erred at summary judgment and in its verdict and judgment after trial in (i) entering judgment for Kalonymus despite Kalonymus' failure to prove the damages element of its contractual claims and (ii) ignoring corporate law and awarding to Kalonymus damages it did not suffer. See* ARGUMENT III.

4.    **Kalonymus Failed to Mitigate its Damages:** Even assuming Kalonymus had proven its claims and proven damages, Kalonymus should not have been awarded any damages beyond January 2022 because Kalonymus could have reasonably avoided any damages incurred after that date; by refusing to close in early 2022, Kalonymus allowed its damages to exponentially increase. Thus, the fourth issue is *whether the district court erred in its verdict and judgment after trial by failing to apply the doctrine of avoidable consequences and awarding damages incurred after January 2022. See* ARGUMENT IV.

## **ARGUMENT**

I.    **Kalonymus Is Not Entitled To An Award Of Specific Performance or Damages Because It Did Not Meet Its Burden Of Proof of Establishing its *Prima Facie* Case**

    A.    **A Plaintiff Seeking Specific Performance and Damages for Breach of Contract Must Prove It Is Ready, Willing, and Able to Perform the Contract According to its Terms**

This Court, as recently as 2020, held that:

> To establish a prima facie claim for specific performance of a contract or for damages for breach of a contract, Florida law requires the plaintiff to show it was ready, willing, and able to perform the contract.

*M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1337 (11th Cir. 2020). As further explained by Florida's Supreme Court, performance must match what the contract requires:

> [W]here the suit is for specific performance the complainant must have offered to do and perform *all things* that would entitle him to the relief prayed, and amongst other of such things ***must have tendered a conveyance as contemplated by the contract***. Otherwise he would be asking that the defendant be required to perform while he had not performed.

*Miami Bond & Mortgage Co. v. Bell*, 133 So. 547, 547 (Fla. 1931) (emphasis added).

> [T]he performance tendered can neither seek to change the tendering party's duties under the contract nor attempt to impose new contractual terms upon the other party, and where it does, specific performance will not be granted, since otherwise, the party making the tender could coerce new or additional terms from the other party.

36

25 *Williston on Contracts* § 67.15 (4th ed. May 2023 update) (footnotes omitted). Thus, "a tender of performance which contains a new or improper condition ***disqualifies that party from obtaining specific performance***." *Id.* (emphasis added).

Significantly, ***"it is the burden of proof of the plaintiff*** to show it is ready, willing and able to perform the contract to establish a prima facie case ***for specific performance***." *Hollywood Mall, Inc. v. Capozzi*, 545 So. 2d 918, 920 (Fla. 4th DCA 1989) (emphasis added). It is also the plaintiff's burden of proof to show it is ready, willing and able to perform the contract to establish a prima facie case ***for damages*** for breach of contract. *See M&M*, 982 F.3d at 1337. The "burden of proving readiness, willingness, and ability is a continuing one, that extends to all times relevant to the contract and thereafter." 25 *Williston on Contracts* § 67.15.

"[A] plaintiff's requirement to have sufficient evidence for a prima facie case can never be a peripheral or distracting issue — it is a core, threshold issue." *M&M Realty Partners at Hagen Ranch, LLC*, No. 9:17-cv-811135, 2018 WL 3536273, at *2 (S.D. Fla. July 23, 2018). This is because a plaintiff's "failure to show it was ready, willing, and able to perform under the contract is ***fatal*** to its claims for damages and specific performance under the contract." *M&M*, 982 F.3d at 1336, 1337 (emphasis added). Here, Kalonymus could not show it was ready, willing, and able to perform under the MPA, which is fatal to its claims for damages and specific performance.

37

### B.    Kalonymus Was *Not Willing* to Perform the Contract

It is undisputed that Kalonymus was not willing to perform under the terms of MPA. Each time Kalonymus was asked to close according to the terms of the MPA—no less than three different times in December 2021, January 2022, and February 2022— Kalonymus refused to do so. *See* Facts I.1.C–E *supra*. Worse yet, Kalonymus openly, and repeatedly, admitted that it would only agree to close if the Sellers first agreed to significantly reduce the purchase price in the MPA. Kalonymus' admissions speak for themselves:

> ***Admitted that Kalonymus rejected [Sellers'] attempt to close on January 5, 2022 on the MIPA's original terms and purchase price***… (Doc. 40 ¶ 10 (emphasis and alterations added));

> Kalonymus's position then and now continues to be ***that it would be willing to proceed with the transaction if and when [Sellers] agreed to compensate it*** for the damages Kalonymus suffered as a result of the aforementioned breaches. Since [Sellers] refused to do so, Kalonymus did not proceed with closing in January 2022. (Doc. 35-3 ¶ 2) (emphasis and alterations added)

Thus, it is uncontested that Kalonymus was ***not willing*** to perform according to the terms of the MPA and was only willing to perform under new and different terms altogether (specifically, terms that changed and reduced the purchase price by $750,000 in January 2022 and then $1,150,000 in February 2022). *See* Facts I.1.C–E *supra*.

### C.       Kalonymus Was *Not Able* to Perform the Contract

Kalonymus also failed to prove that it was *able* to perform. This Court recently addressed the "ability" prong of the "ready, willing, and able" requirement in detail in *M&M Realty Partners* ("*M&M*"), which is on all fours with this action from both a factual and legal point of view.

### i.       The Applicable Facts and Law in M&M

In *M&M*, this Court explained what a plaintiff must show to prove it is able to perform a contract:

> A purchaser may show it is financially ready and able by showing it has (1) the necessary 'cash in hand,' (2) 'personal possession of assets … and a credit rating' that show a 'reasonable certainty to command the requisite funds,' or (3) 'a binding commitment … by a financially able third party.

982 F.3d 1333, 1337. In simple terms, a plaintiff must prove that ***it*** (and not someone else) is able to command the necessary funds to make the purchase. *See id.*

In *M&M*, the buyer, M&M Realty Partners at Hagen Ranch, LLC ("M&M"), initiated a lawsuit against the seller for specific performance (Count I) and breach of contract seeking damages (Count II). *See M&M*, 2018 WL 3536273, at *2. Defendant argued there was no evidence that plaintiff had the financial ability to pay the purchase price and, thus, failed to show it was ready, willing, and able to close the transaction. *See id.* Plaintiff, M&M, argued that it *was* ready, willing and able to perform under the contract because its principals, Messrs. Marino and Morris, had

the funds to close. *See id.* Marino and Morris were members of the members of

M&M as shown below:



*M&M*, 982 F.3d at 1336, 1337. Plaintiff pointed to evidence showing Marino and

Morris had the ability to pay the purchase price (like here, roughly $5,000,000), but

the district court found this was insufficient:

> **[T]he Plaintiff in this case is not Mr. Marino. Mr. Marino was not the purchaser of the real property in this case—Plaintiff was. Mr. Marino is an owner of Plaintiff.** Even when an individual with an interest in a transaction testifies that he or she was willing to provide a purchaser with the required money to close, **the purchaser is still not entitled to specific performance if there is no evidence of a *binding* commitment for the funds to be provided**…

2018 WL 3536273, at *2 (citing *Capozzi*, 545 So. 2d at 920 and others) (emphasis

added). The district court found that M&M did not show a binding commitment from

either Marino or Morris to provide those funds to M&M, the plaintiff and purchaser

seeking specific performance and damages. *Id.* at *2-*3. A binding commitment—

and nothing short of that—was required because without it, Marino and Morris had no obligation to provide those funds to M&M. *Id.* Because Marino and Morris had no obligation to provide the funds to M&M, M&M did not have any ability to "command" the funds and could not be considered ready, willing, and able to perform. *Id.* ("[A] purchasing entity cannot be considered to be ready, willing and able to perform when its only ability to close is derived from funds not within its control and subject to the gratuitous payment by another." (quoting *Capozzi*, 545 So. 2d at 920)).

On appeal, the Eleventh Circuit agreed, finding Marino and Morris's choice to use a separate corporate entity as the contracting purchaser (which insulated them from personal liability) could not be ignored: "[a]s the district court pointed out, if the situation were reversed and the [Seller] were suing M&M for specific performance and damages, it clearly would be inappropriate to pierce those corporate veils; so too is it inappropriate to disregard the corporate forms Marino and Morris used here to insulate themselves from the would-be corporate purchaser." 982 F.3d at 1338 (alterations added).

>    ii.    **Like in M&M, Kalonymus Failed to Show It Had the Ability to Pay the Purchase Price**

The record contains no evidence whatsoever that Kalonymus, ***the only plaintiff and contracting party with the Sellers***, ever had the financial ability to pay the purchase price under the contract. *See* Facts I.2.A, *supra*. Kalonymus did not

present any evidence — at trial or at *any* point during this case — that it had (1) $5,450,000 in cash,[24] (2) assets and a credit rating sufficient to command that sum, or (3) a binding commitment from a financially able third party to provide the funds. *See id.*

*First*, the record is devoid of any evidence that Kalonymus had the necessary cash to close — in other words, that it had a bank account in its name with the $5,450,000 necessary to close.[25]

*Second*, there is no record evidence that Kalonymus had the ability to command the requisite cash to close (i.e., the ability to access credit). And there was

---

[24] In its Verdict, the district court concluded the purchase price was $5,150,000 because at trial, Kalonymus introduced evidence of an Amendment to the MPA that purported to change the purchase price from $5,450,000 to $5,150,000. (Doc. 162) Yet, the evidence at trial also showed the Amendment was never signed by Mr. Van Peborgh, and, under section 6.8 of the MPA, the parties "irrevocably agree[d] that no attempted amendment, modification, termination, discharge or change (collectively, Amendment") of this Agreement shall be valid and effective, unless the parties shall mutually agree in writing to such Amendment." Consequently, the Amendment was ineffective, and the purchase price remained $5,450,000. *See, e.g.*, *City of Pompano Beach v. Beatty*, 222 So. 3d 598, 600 (Fla. 4th DCA 2017) (noting the court's task is to apply the parties' contract as written). Nonetheless, whether the purchase price was $5,450,000 or $5,150,000, the analysis by Sellers herein does not change.

[25] Rather, the evidence at trial established Kalonymus never had the funds necessary to pay the deposit required under the MPA, which Zeff had to borrow from his father's company, Carmel Partners. (Doc. 168-1 at 141–143 [140:13–142:20])

no evidence in the record on Kalonymus' assets and its credit rating, as required by law. *See, e.g.*, *M&M*, 982 F.3d at 1337.

*Third*, and lastly, there is also no record evidence that Kalonymus obtained a binding commitment from a financially able third party to provide to Kalonymus the necessary funds to close. *See, e.g.*, (Doc. 168-1 at 88 [87:9-10]) ("Kalonymus was not a borrower, correct?" A: "Of this advance, no."); (Doc. 159-3 (Trial Ex. E)).

Indeed, the only evidence introduced on *anyone's* ability to command some amount of funds necessary for closing was limited to evidence that a different entity altogether—3667 Poinciana—had a commitment from a lender, Newmark, for *part* of the purchase price ($2,539,000). *Id.* But this evidence is insufficient to satisfy Kalonymus' burden under Florida law, and under *M&M*. *See M&M*, 982 F.3d at 1338 ("M&M once again, however, fails to explain how it, as the purchaser of the property, could 'command' the funds of Marino or Morris, neither of whom had made a binding commitment to provide those funds."). The fact that 3667 Poinciana had a commitment from Newmark is ultimately irrelevant because 3667 Poinciana is not the plaintiff in this case, is not a party to the MPA, is not in contractual privity with the Sellers, and had no contractual obligation with Sellers to close. [26]

---

[26] As to the remaining $2,911,000 needed to purchase the shares, there is also no evidence in the record that Kalonymus had a binding commitment from any financially-able third party to provide that sum to Kalonymus. Zeff's testimony at trial was simply that the cash for the remaining balance of the purchase price was going to be paid in small part (an unspecified amount) by Kalonymus, and the

***

As stated before, it is Kalonymus' demonstrated ability to finance the purchase — and no one else's — that is relevant under *M&M* and Florida law. Here, the record contains no evidence that Kalonymus ever had that ability. Kalonymus did not show that it could command the necessary funds to close. At bottom, although it was Kalonymus' burden to do so, it "failed to make out a prima facie claim for specific performance or for damages for breach of contract because [Kalonymus] did not provide evidence that it was ready, willing, and able to perform under the contract -- specifically, that it had the necessary funds to make the purchase." *See M&M*, 982 F.3d at 1335. Kalonymus' failure is ***"fatal"*** to its claim for damages and specific performance. *Id.* (emphasis added).

---

majority (also an unspecified amount) by "another entity." (Doc. 168-1 at 45 [44:13–16]) That entity was never identified, and no evidence was ever presented that the unidentified entity (1) was financially able and (2) had made a definite, binding commitment to Kalonymus to provide the cash needed to close.

II. **Kalonymus is Not Entitled to An Award of Specific Performance or Damages Because it Failed to Act in Accordance with Section 8.2 of the Agreement and Florida Law and Materially Breached the Agreement**

After the Sellers' October 2021 default, Kalonymus exercised its right to not terminate the MPA and instead enforced the MPA through an action for specific performance. Having made that choice, Kalonymus was itself obligated to perform the MPA — specifically, by closing and paying the agreed to purchase price. Its failure to do so was inconsistent with section 8.2 and Florida law, and was a breach of the MPA.

A. **Section 8.2 of the MPA and Established Florida Law**

Following Sellers' default in October 2021, Kalonymus had two sole and exclusive remedies under the plain language of section 8.2: (1) terminate the MPA and recover its deposit or (2) *not* terminate the MPA and instead enforce the MPA in an action of specific performance, without waiving its right to recover damages. Section 8.2 could not be clearer:

> 8.2    In the event of a default by Seller under the terms of this Agreement, Buyer shall have the sole and exclusive remedies of either (i) terminating this Agreement, and receiving the return of its Deposit, whereupon all parties hereto shall be released and relieved from any and all further liability or obligations hereunder; or (ii) proceeding to enforce this Agreement by an action for specific performance, as Buyer shall thereby, without waiving Buyer's right to recover any and all losses, damages, costs and expenses resulting from Seller's default. Notwithstanding anything to the contrary herein contained, in the event of an intentional willful failure of Seller to perform any matter reasonably within its control or in the event any of the warranties and representations made by Seller herein shall be in any material respect inaccurate or there is an omission of a material fact necessary to make any representation of Seller not misleading in light of the circumstances under which it was made, Buyer shall have any and all remedies available to Buyer under the laws of the State of Florida.

Under Florida law, too, when a contract is breached the contract does not automatically terminate; rather, the non-breaching party must decide whether to (i)

terminate the contract or (ii) continue to enforce the contract, while retaining a claim for damages. *See Merrill Stevens Dry Dock Co. v. M/V Yeocomico II*, 329 F.3d 809, 816 (11th Cir. 2003):

> A material breach of a contract does not automatically and ipso facto end a contract. It merely gives the injured party the right to end the agreement. If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

The non-breaching party's decision is consequential — if the non-breaching party elects to continue the contract, he remains obligated to perform and will be liable to the other party for any subsequent failure to do so:

> There are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed on either side is continued in spite of a known excuse, the right to rely on the known excuse is waived; in turn, the defense based on the excuse is lost and the party who would otherwise have been excused is liable if it subsequently fails to perform.

*GPDEV, LLC v. Team Sys. Int'l, LLC*, No. 4:18-cv-442, 2021 WL 8015621, at *3 (N.D. Fla. Feb. 22, 2021) (quoting 13 *Williston on Contracts* § 39:31 (4th ed. 2013)).

**B.      The Undisputed Facts Show Kalonymus Ignored and Violated Both Section 8.2 and Florida Law and Breached the MPA**

Kalonymus' actions, when viewed in the context of the requirements of section 8.2 and the principles of law set forth above, clearly amounted to an undisputed breach of the MPA. There are only four material facts to this issue and each of them is undisputed and admitted to by Kalonymus:

| Material Fact | Kalonymus' Admissions |
|---|---|
| 1. Marmol and Van Peborgh failed to close in October 2021. (Doc. 35 ¶ 6) | 1. "[Sellers'] inability to close on or before October 8 2021 materially breached the MIPA." (Doc. 40 ¶ 6) |
| 2. Kalonymus nonetheless elected to continue under the MPA and sued for specific performance in December 2021, stating it was "prepared to pay the Purchase Price" and demanding "that the closing be set within a reasonable time." (Doc. 35 ¶ 7) | 2. "Because of [Sellers'] breaches and tortious conduct, Kalonymus filed a lawsuit against them in December 2021, seeking specific performance and damages, which remedies are permissible under Section 8.2 of the MIPA." (Doc. 40 ¶ 6) |
| 3. Marmol and Van Peborgh moved forward under the MPA, signed the closing documents, and sent them to Kalonymus on January 5, 2022. (Doc. 35 ¶ 9) | 3. "Admitted that [Sellers] did, in fact, send Kalonymus proposed closing documents on or about January 5, 2022." (Doc. 40 ¶ 9; Doc. 35-1 ¶ 15) |
| 4. Thereafter, Kalonymus refused to close. (Doc. 35 ¶ 10, 11) | 4. "Admitted that Kalonymus rejected [Sellers'] attempt to close on January 5, 2022 on the MIPA's original terms and purchase price, without consideration of [Sellers'] substantial harm caused to Kalonymus." (Doc. 40 ¶ 10). |

The undisputed record evidence shows that after the Sellers' default in October 2021, Kalonymus moved to enforce the MPA and, consequently, remained bound by its terms. *GPDEV, LLC*, 2021 WL 8015621, at *3; *Merrill Stevens*, 329 F.3d at 817 (non-breaching party who elected to continue the contract despite the other party's breach "remained bound by its terms."). When Sellers then executed

47

and sent the closing documents to Kalonymus in January 2022, Kalonymus — ***who was still bound under the MPA*** — was obligated to perform and pay the purchase price agreed to in the MPA. Kalonymus' refusal to close unless Sellers accepted a lower purchase price ***repudiated and breached the MPA***. *See 24 Hr Air Serv., Inc. v. Hosanna Cmty. Baptist Church, Inc.*, 322 So. 3d 709, 712 (Fla. 3d DCA 2021) ("Repudiation of an agreement can be shown where one party makes additional demands not included in the initial agreement.").[27] Consequently, Sellers were relieved of their duty to further perform, *id.* at 712 (party's repudiation of the contract "relieves the non-breaching party of its duty to further perform and creates an immediate cause of action for breach of contract"), and had the right to retain the buyer's deposit as liquidated damages under section 8.1 of the contract.[28]

---

[27] Section 8.2 does not give Kalonymus the right to collect its alleged (and unproven) damages prior to and as a condition to closing, and does not allow Kalonymus to fashion its own remedy or resort to self-help. Section 8.2 provides for specific performance "**without waiving**" Buyer's right to recover damages, **not "so long as"** Buyer recovers damages.

[28] *See* (Doc 8-1 at 18, § 8.1 ("If Buyer shall default ***in the payment of the Purchase Price***, or otherwise default in any of the terms, covenants and conditions of this Agreement on the part of Buyer to be performed, Seller shall retain the Deposit as full and agreed upon liquidated damages …") (emphasis added)).

**III.    Kalonymus is Not Entitled to Judgment in its Favor or an Award of Damages Because (A) It Did Not Prove Damages and (B) the District Court Ignored Corporate Law and Granted Kalonymus an Impermissible Windfall.**

   **A.    Kalonymus Failed to Prove Damages**

      **i.    Kalonymus Failed to Prove that it (and Not Someone Else) Suffered Damages**

Damages are an essential element of a claim for breach of contract that must be proven with competent, substantial evidence. *See Farman v. Deutsche Bank Nat'l Tr. Co. as Tr. for Long Beach Mortgage Loan Tr. 2006-05*, 311 So. 3d 191, 194-195 (Fla. 2d DCA 2020) (stating that "[u]nder Florida law, damages are an essential element of an action for breach of contract" and "a damages award must be supported by legally sufficient evidence" (citation omitted)).

Kalonymus—not Zeff, not the Zeff family entities, and not any other entity—is the plaintiff; as such, Kalonymus had to prove that it suffered damages to obtain relief. *See Asset Mgmt. Holdings, LLC v. Assets Recovery Ctr. Invs. LLC*, 238 So. 3d 908, 912 (Fla. 2d DCA 2018) ("The burden of proving damages rested solely with the plaintiff entities."). Yet, like in *Farman*, here there is no record evidence that Kalonymus suffered "a single dime" in damages. *See* 311 So. 3d at 195. The record shows that even if Sellers had not breached and the transaction closed in October 2021:

- Kalonymus was not going to lose out on Newmark's favorable loan terms because Kalonymus was not the borrower on that loan;

- Kalonymus was not going to collect any net rents or profits from the rents because it was neither the landlord nor going to be an owner of Best Peacock (the Poinciana Entities were going to own Best Peacock);

- Kalonymus was not going to pay any expenses twice, for it never even paid a single expense once;

- Kalonymus was not going to lose out on a tax advantage because only individual members of the purchasing entities (the Poinciana Entities) can use the tax deductions.

- Kalonymus was never going to be paid the $1,313,350 awarded in "cost of equity."[29]

*See* FACTS I.2.ii. Indeed, as Habibi admitted, the damages he quantified were not Kalonymus' damages but were damages that, if suffered at all, would have been suffered by an assortment of third parties. (Doc. 98-1 at 32 [145:24–146:22]). Rather than calculate damages to Kalonymus, Habibi calculated damages to, as he put it, "the collection of entities that comprise Max Zeff's investment." (*Id.* at 20 [73:5-8]).

### ii.    In Finding These Were Kalonymus' Damages, The District Court Ignored Corporate Law on Legal Separateness

Habibi bundled together the alleged damages that would be suffered by multiple third parties and called them Kalonymus' damages. The only way Habibi was able to do this was, as he has conceded, by willfully ignoring a series of fundamental principles of corporate law.

---

[29] Kalonymus also never had to pay anyone $1,313,350 as a result of the deal not closing in October 2021. At bottom, Kalonymus was awarded $1,313,350 without a single piece of evidence showing any loss or harm to Kalonymus amounting to $1,313,350.

The concept of separate corporate form and personalities is well-established and uniform across the country. As explained by the U.S. Supreme Court:

> A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities… Separate legal personality has been described as 'an almost indispensable aspect of the public corporation'… A corporation and its stockholders are generally to be treated as separate entities.

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003) (quotation marks and citations omitted).

Kalonymus has a different legal identity from its owner, Zeff, Zeff's father's companies, the Poinciana Entities, and even Best Peacock. All these entities and individuals are separate from each other under the law. *See* 1 W. Fletcher Cyclopedia of the Law of Private Corporations § 25 ("A duly organized corporation enjoys a legal identity separate and apart from its shareholders, directors and officers"). Damages suffered by those individuals and entities, therefore, are not the same as damages suffered by Kalonymus, and bundling them together does not make them so. In fact, a "shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest." *Dole Food Co*., 538 U.S. at 474–75 (citing W. Fletcher § 31).

The district court erred when, in disregard of these legal principles, it ignored the separate legal personalities between Kalonymus and the other individuals and

entities whose purported damages it claimed as its own. While Habibi, as a real estate "expert," may have found it appropriate to do so, courts are bound by and required to apply the law, and here "the well-settled rule is that a corporation is a separate legal entity and, thus, that separate corporate form cannot be disregarded." *Molenda v. Hoechst Celanese Corp*., 60 F. Supp. 2d 1294, 1300 (S.D. Fla. 1999), aff'd, 212 F.3d 600 (11th Cir. 2000); *see also M&M*, 982 F.3d at 1338 (noting it was "inappropriate to disregard the corporate forms [members of members of an LLC] used [] to insulate themselves from the would-be corporate purchaser." (alterations added)).

### iii.    Proffering Evidence Of The Damages Suffered By Third Parties Was Insufficient To Carry Kalonymus' Burden Of Proving Damages

In *Farman*, like here, the only evidence the plaintiff presented in support of its claimed damages was evidence of damages suffered by other entities. *See* 311 So. 3d at 195. The court found that "[the plaintiff] failed to prove that it was the entity that incurred the damages" and "never proved that it spent a dime. Instead, the evidence showed that [another entity] paid the [alleged costs and fees]." *Id.* (alterations added). Consequently, the court found there was a "lack of competent, substantial evidence to prove the [plaintiff] incurred the damages" it was seeking (and which the trial court erroneously awarded). The court reversed the award of those damages to the plaintiff, reversed the judgment to the plaintiff on that count

altogether, and directed the trial court to enter judgment in favor of the defendant on that claim instead:

> In summary, in count II the Trust did not…properly prove any damages with competent, substantial evidence. Because damages are the third essential element of a breach of contract claim, the Trust failed to prove its claim, and we reverse the judgment on count II for breach of the settlement agreement…Thus, we remand for the trial court to enter judgment that finds in favor of Farman on count II.

*Id.* at 197 (alteration added). Here, because Kalonymus similarly failed to prove it (and not other entities or individuals) suffered damages, the same result should apply: the district court's judgment on breach of contract against Sellers should be overturned, with instruction that judgment be entered in favor of Sellers.

**B.**    **The Court Did Not Put Kalonymus In The Position It Would Have Been Had The Deal Closed In October; It Put Kalonymus In A Better Position**

The goal of an award of damages in a breach of contract action is "to restore the injured party to the condition which he would have been in had the contract been performed." *Koplowitz v. Girard*, 658 So. 2d 1183, 1184 (Fla. 4th DCA 1995) (emphasis added); *see also* 24 *Williston on Contracts* § 64:1 (4th ed. May 2023 update) ("This goal of compensating the promisee following a breach of contract by the promisor is, to the extent possible through an award of money damages, to place the plaintiff-promisee in as good a position as he or she would have occupied had the defendant-promisor not breached the contract.").

Importantly, "[a] party can neither receive more than it bargained for *nor should it be put in a better position than it would have been in had the contract been properly performed*." *Koplowitz*, 658 So. 2d at 1184 (emphasis added) (quoted by *Air Caledonie Int'l v. AAR Parts Trading, Inc*., 315 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004) (Altonaga, J.)); *see also* 24 *Williston on Contracts* § 64.1 ("[O]rdinarily a plaintiff may recover no more than is necessary to provide what he or she would have obtained had both parties fully performed their respective promises.").

By awarding Kalonymus millions of dollars in damages Kalonymus never suffered, the district court did not put Kalonymus in the position it would have been in had Sellers not breached and the transaction closed in October 2021 — it put Kalonymus in a *much better position*.

For instance, the district court awarded Kalonymus $175,028 for lost profits from net rents, even though Kalonymus was never going to receive those rents, *even if the transaction had timely closed in October 2021. See* FACTS I.2.B. The district court awarded $14,217 for lost tax savings that Kalonymus was *never* going to receive, *even if the transaction had timely closed in October 2021. Id.* The district also awarded Kalonymus $50,650 for duplicate expenses, *even though Kalonymus never came out of pocket to pay even one set of expenses. Id.* Worst of all, the district court awarded Kalonymus a whopping $1,313,350 even though there is no evidence *whatsoever* that had the Sellers not breached and the transaction closed in October

2021, Kalonymus would have received $1,313,350 it ended up not receiving on account of the breach. *Id.* Similarly, there is absolutely no evidence that Kalonymus ended up spending $1,313,350 as a result of the deal not closing in October 2021. Much like with the "duplicate expenses" category, here, too there is no evidence establishing Kalonymus ever lost $1,313,350—thus necessitating it to be compensated and made whole by Sellers. *Id.*

Simply put, the district court granted Kalonymus a windfall and allowed it to recover much, much more (specifically, $1,553,245 more) than it "would have obtained had both parties fully performed their respective promises." 24 *Williston on Contracts* § 64.1.

This is flatly at odds with the fundamental purpose of awarding damages, as set forth in well-settled law: "[t]he purpose of compensatory damages is to **compensate**, not to punish defendants or **bestow a windfall on plaintiffs**." *MCI Worldcom Network Services, Inc. v. Mastec, Inc*., 995 So. 2d 221, 223 (Fla. 2008) (quotation marks and citation omitted)*; see also* 24 *Williston on Contracts* § 64:1 (4th ed.) ("[T]he disappointed promisee is generally entitled to an award of money damages in an amount **reasonably calculated to make him or her whole and neither more nor less….**" (emphasis added)).

***

The district court's failure to follow fundamental tenets of corporate law and contract law on damages was error, and its award of damages to Kalonymus should be reversed.

## IV. Even if Kalonymus Had Proven Damages (Which it Did Not) Kalonymus Should Have Not been Awarded Damages Beyond January 2022 Because It Failed to Mitigate Damages

A "relevant principle of contract law in Florida is the principle of "avoidable consequences," which is a broadly applicable defense that "prevents a party from recovering those damages inflicted by the wrongdoer that the injured party could have reasonably avoided." *Sys. Components Corp. v. Fla. Dep't of Transp*., 14 So. 3d 967, 982 (Fla. 2009) (internal quotation marks omitted); *see also Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004) (Altonaga, J.) ("[O]ne seeking damages as a result of another's act cannot recover those damages which he could have avoided by the exercise of reasonable care.").

Here, Kalonymus could have avoided the majority of its claimed damages simply by closing in January 2022 when Sellers offered to do so. By Habibi's own calculations, no more than $417,186[30] of the $2,586,533[31] of the damages it claimed at trial had accrued by January of 2022. (Doc. 77-13 at 22–23) Kalonymus not only

---

[30] This amount comprises $98,990 in cost of debt, $253,546 in cost of equity, $50,650 in duplicate expenses, and $14,000 in lost profits. (Doc. 77-13 at 22–23)

[31] This amount excludes the portfolio-related damages the district court declined to award. (Doc. 162 at 4–5)

should have closed in January 2022 but was required to do so under Florida law.

The district court nevertheless erred when it refused to apply the "avoidable consequences" doctrine because (1) "Sellers never made any specific offer to pay for Kalonymus's damages prior to their proposed closing dates," and (2) "Kalonymus ask[ing] . . . for inflated damages does not equate to its acting in bad faith or failing to mitigate its damages." (Doc. 162 at 6) Neither of these observations entitles Kalonymus to fail to comply with its duty to mitigate under the law.

In fact, Sellers weren't required to make a "specific offer" to settle Kalonymus' damages claim for Kalonymus to close—as explained above, section 8.2 provided the exclusive remedies available to Kalonymus and Sellers faithfully followed the clear language of section 8.2.

And while it is difficult to see how Kalonymus' January and February 2022 deceitful and fraudulent misrepresentations did not amount to bad faith, this ultimately has nothing to do with Kalonymus' duty to mitigate. Florida law on this topic is clear: Kalonymus is not allowed to recover any damages it could have avoided — i.e., the damages it would have avoided had it closed in January or February 2022. *See Sys. Components Corp.*, 14 So. 3d at 982.

## <u>CONCLUSION</u>

Appellants ask the Court to reverse and vacate (i) the summary judgment order

and all related orders; and (ii) the final judgment (together with any subsequent

orders or actions related thereto), and instruct that judgment be entered in favor of

Appellants on all counts.

Dated: March 27, 2024                    Respectfully Submitted,

**HOLLAND & KNIGHT LLP**

*/s/ Jesus E. Cuza*

Jesus E. Cuza
jesus.cuza@hklaw.com
Florida Bar No. 428991
*/s/ Daniel Mahfood*
Daniel Mahfood
daniel.mahfood@hklaw.com
Florida Bar No. 94879
*/s/ Annelise Del Rivero*
Annelise Del Rivero
annelise.delrivero@hklaw.com
Florida Bar No. 1003234
701 Brickell Avenue, Suite 3300
Miami, Florida  33131
Telephone:   (305) 374-8500
Facsimile:   (305) 789-7788

**KULA & ASSOCIATES, P.A.**

*/s/ Elliot B. Kula*
Elliot B. Kula
elliot@kulalegal.com
Florida Bar No. 003794
11900 Biscayne Blvd. Suite 300
Miami, FL 33181
Telephone: (305) 354-3858

*Counsel for Appellants, Francisco Lagos*
*Marmol and Fernando Carlos Van Peborgh*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), in that the brief contains 12,901/13,000 words, excluding the sections of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that the brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

*/s Jesus E. Cuza*
Jesus E. Cuza

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on counsel of record via the Court's electronic filing system on March 27, 2024.

*/s Jesus E. Cuza*
Jesus E. Cuza