IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 23-13678

FRANCISCO MARMOL, et al.,

*Plaintiffs-Appellants*,

v.

KALONYMUS DEVELOPMENT PARTNERS, LLC,

*Defendant-Appellee.*

BRIEF OF DEFENDANT-APPELLEE,
KALONYMUS DEVELOPMENT PARTNERS, LLC

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Katherine M. Clemente
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone: 212.801.9200
clementek@gtlaw.com
miamiappellateservice@gtlaw.com

Brigid F. Cech Samole
Barry L. Rothberg
Robert S. Galbo
GREENBERG TRAURIG, P.A.
333 S.E. Second Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
cechsamoleb@gtlaw.com
rothbergb@gtlaw.com
galbor@gtlaw.com
miamiappellateservice@gtlaw.com

*Counsel for Defendant-Appellee, Kalonymus Development Partners, LLC*

*FRANCISCO MARMOL, ET AL. V. KALONYMUS DEVELOPMENT PARTNERS, LLC*
CASE NO. 23-13678

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee, Kalonymus Development Partners, LLC, submits this list, which includes the trial judge, and all attorneys, persons associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review:

1. Cech Samole, Brigid F. (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

2. Clemente, Katherine M. (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

3. Colomar, Marta (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

4. Creed & Gowdy (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

5. Cuza, Jesus E. (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

6. Del Rivero, Annelise (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

*FRANCISCO MARMOL, ET AL. V. KALONYMUS DEVELOPMENT PARTNERS, LLC*
CASE NO. 23-13678

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

7.  Diaz, Jr., Michael (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

8.  Diaz Reus & Targ, LLP (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

9.  Galbo, Robert S. (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

10. Goodman, The Honorable Jonathan (U.S. Magistrate Judge)

11. Greenberg Traurig, P.A. (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

12. Greenberg Traurig, LLP (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

13. Hadaway, Brant C. (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

14. Holland & Knight LLP (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

15. Kalonymus Development Partners, LLC (Defendant-Appellee)

*FRANCISCO MARMOL, ET AL. V. KALONYMUS DEVELOPMENT PARTNERS, LLC*
CASE NO. 23-13678

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**
**(Continued)**

16. Mahfood, Daniel M. (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

17. Mandel, Joshua M. (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

18. Marmol, Francisco L. (Plaintiff-Appellant)

19. Peborgh, Fernando V. (Plaintiff-Appellant)

20. Rothberg, Barry L. (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

21. Scola, The Honorable Robert N. (U.S. District Judge)

22. Smith, Andrew K. (Counsel for Plaintiffs-Appellants Francisco L. Marmol and Fernando V. Peborgh)

23. Winston & Strawn (Counsel for Defendant-Appellee Kalonymus Development Partners, LLC)

*FRANCISCO MARMOL, ET AL. V. KALONYMUS DEVELOPMENT PARTNERS, LLC*
**CASE NO. 23-13678**

**CERTIFICATE OF INTERESTED PERSONS AND**
**<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Defendant-Appellee, Kalonymus Development Partners, LLC, makes the following statements as to corporate ownership:

Defendant-Appellee Kalonymus Development Partners, LLC ("Kalonymus") does not have a parent corporation. No publicly held corporation owns 10% or more of Kalonymus' stock.

_____ */s/ Brigid F. Cech Samole* _____
Brigid F. Cech Samole

## STATEMENT REGARDING ORAL ARGUMENT

As conceded in the Principal Brief of Appellants, Francisco Lagos Marmol and Fernando Carlos Van Peborgh, the issues raised are "readily discernible from the record." (Appellants' Brief at i). Therefore, oral argument would not materially benefit the Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF CITATIONS .......................................................................................v

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES............................................................................1

STATEMENT OF THE CASE AND FACTS ........................................................1

I.      THE PARTIES. .........................................................................................1

II.     THE AGREEMENT. ..................................................................................2

III.    APPELLANTS' BREACH OF THE AGREEMENT....................................4

IV.     THE DISTRICT COURT PROCEEDINGS. ..............................................7

        A.      The Pleadings. ...............................................................................7

        B.      Appellants' Summary Judgment Motion. .......................................9

        C.      Kalonymus' Summary Judgment Motion. .....................................10

V.      THE OMNIBUS ORDER. .......................................................................12

        A.      Kalonymus' Breach of Contract Claims. .....................................13

        B.      Kalonymus' Damages. ..................................................................14

        C.      Kalonymus' Negligent Misrepresentation Claim. ........................14

        D.      The Damages Trial. ......................................................................15

        E.      Verdict and Order Following Non-Jury Trial. ..............................28

        F.      The Final Judgment. .....................................................................30

**TABLE OF CONTENTS**
**(Continued)**

**Page**

VI.    STANDARD OF REVIEW. .......................................................................30

SUMMARY OF THE ARGUMENT ....................................................31

ARGUMENT ....................................................................................33

I.    THE DISTRICT COURT CORRECTLY FOUND KALONYMUS
      WAS ENTITLED TO SPECIFIC PERFORMANCE AND
      DAMAGES. .......................................................................................33

      A.    Kalonymus was Willing to Perform Under the Agreement. ..............33

      B.    Kalonymus Was Able to Perform Under the Agreement. .................36

            1.    Appellants waived argument that Kalonymus was not "ready
                  and able" to close. .........................................................36

            2.    *M&M Realty Partners* does not alter the district court's
                  Order. ............................................................................38

            3.    The evidence supports that Kalonymus had the ability to pay
                  the purchase price. .........................................................39

II.   KALONYMUS COMPLIED WITH SECTION 8.2 OF THE
      AGREEMENT AND FLORIDA LAW. ......................................................42

III.  THE DISTRICT COURT CORRECTLY FOUND KALONYMUS
      WAS ENTITLED TO JUDGMENT AND DAMAGES. ............................45

      A.    The Record Evidence Supports the Award of Damages. ....................45

            1.    Kalonymus established it suffered damages. ................................45

            2.    The district court applied relevant corporate law on legal
                  separateness. ...................................................................49

            3.    Appellants' reliance on *Farman* does not change this result. ........50

## TABLE OF CONTENTS
### (Continued)

**Page**

    B.    The District Court Correctly Placed Kalonymus in the Position It Would Have Been in Had Appellants Not Breached the Agreement. ............................................................................................50

IV.    APPELLANTS FAILED TO PROVE KALONYMUS' DAMAGES SHOULD BE REDUCED UNDER THE DOCTRINE OF AVOIDABLE CONSEQUENCES. ..............................................................52

CONCLUSION .........................................................................................55

CERTIFICATE OF COMPLIANCE ........................................................57

CERTIFICATE OF SERVICE ..................................................................57

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*Anoushfar v. Lexington Ins. Co.*,
No. 21-11244, 2021 WL 4848073 (11th Cir. Oct. 18, 2021) .............................33

*Buckley v. Sec'y of Army*,
97 F.4th 784 (11th Cir. 2024) .................................................................30

*Copeland v. Georgia Dep't of Corr.*,
97 F.4th 766 (11th Cir. 2024) .................................................................30

*Del Monte Fresh Produce Co. v. Net Results, Inc.*,
77 So. 3d 667 (Fla. Dist. Ct. App. 2011)..................................................31

*Farman v. Deutsche Bank Nat. Tr. Co., as Tr. for Long Beach Mort.
Loan Tr. 2006-05*,
311 So. 3d 191 (Fla. Dist. Ct. App. 2020) ............................................50

*GPDEV, LLC v. Team Sys. Int'l, LLC*,
4:18CV442-RH-MAF, 2021 WL 8015621 (N.D. Fla. Feb. 22,
2021) ...........................................................................................43, 44

*Hamilton v. Southland Christian Sch., Inc.*,
680 F.3d 1316 (11th Cir. 2012) ..............................................................21

*Hollister Inc. v. Zassi Holdings, Inc.*,
No. 20-10636, 2021 WL 5984983 (11th Cir. Dec. 16, 2021) ............................53

*Invego Auto Parts, Inc. v. Rodriguez*,
34 So. 3d 103 (Fla. Dist. Ct. App. 2010)..................................................33

*Island Travel & Tours, Ltd., Co. v. MYR Indep., Inc.*,
300 So. 3d 1236 (Fla. Dist. Ct. App. 2020) ............................................14

*M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni*,
982 F.3d 1333 (11th Cir. 2020) .......................................... 33, 36, 38, 39, 40, 41

*Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II*,
329 F.3d 809 (11th Cir. 2003) ..........................................................44, 45

## TABLE OF CITATIONS
### (Continued)

**Page(s)**

*Mid-Continent Cas. Co. v. Adams Homes of Nw. Fla. Inc*,
   809 F. App'x 719 (11th Cir. 2020) ....................................................50

*Perper v. Edell*,
   35 So. 2d 387 (Fla. 1948) ...............................................................39

*Quantum Comms. Corp. v. Star Broadcasting, Inc*.,
   491 F. Supp. 2d 1123 (S.D. Fla. 2007).............................................35

*Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp*.,
   10 F.3d 1563 (11th Cir. 1994) ....................................................37, 38

\**Sapuppo v. Allstate Floridian Ins. Co*.,
   739 F.3d 678 (11th Cir. 2014) ........................................21, 33, 40, 48

*Sys. Components Corp. v. Fla. Dep't of Transp*.,
   14 So. 3d 967 (Fla. 2009) ...............................................................52

*Tartell v. S. Fla. Sinus & Allergy Ctr., Inc*.,
   790 F.3d 1253 (11th Cir. 2015) .......................................................30

*Trinity Quadrille, LLC v. Opera Place, LLC*,
   42 So. 3d 884 (Fla. Dist. Ct. App. 2010)..........................................35

*United States v. Willis*,
   649 F.3d 1248 (11th Cir. 2011) .......................................................21

\**Wiborg v. Eisenberg*,
   671 So. 2d 832 (Fla. Dist. Ct. App. 1996)....................................33, 35

**Other Authorities**

Fed. R. Civ. P. 52(a)(6)......................................................................30

Fla. Civ. Prac. Damages § 2.43 (6th ed. 2005)......................................52

## STATEMENT OF JURISDICTION

Defendant-Appellee, Kalonymus Development Partners, LLC (Kalonymus), does not dispute the jurisdictional statement of Plaintiffs-Appellants, Francisco Lagos Marmol and Fernando Carlos Van Peborgh (collectively, Appellants). *See* Appellants' Principal Brief (Brief) at 1.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly granted summary judgment to Kalonymus on its specific performance claim, based on Appellants' undisputed breach of contract.

2.    Whether the district court correctly found that Kalonymus suffered damages based on Appellants' undisputed breach of contract and Kalonymus' unrebutted expert testimony.

## STATEMENT OF THE CASE AND FACTS

### I.    THE PARTIES.

Kalonymus is a real estate investment and development firm that is 100% owned by Maximilian Zeff. R:77-11. Appellants each owned a 50% membership interest in Best Peacock Inn, LLC (Best Peacock Inn). R:137:2. Best Peacock Inn was the fee simple owner of two single family homes and twelve apartment units, as well as the underlying real property located at 3677 Poinciana Avenue, Miami, Florida 33133 (the Property). *Id*.

## II.    THE AGREEMENT.

On June 28, 2021, Kalonymus and Appellants executed a Membership Interest Purchase Agreement (Agreement), by which Kalonymus would purchase from Appellants their membership interest in Best Peacock Inn. R:1:2-3; R:1-1. While the parties' deal was crafted as a "Membership Interest Purchase Agreement," it was effectively a sale of the Property by Appellants to Kalonymus. R:1-1.

In Sections 2.2, 2.3 and 6.1(a) of the Agreement, the parties agreed to a purchase price of $5.45 million with a deposit of $131,000, and the closing was scheduled to occur on or before September 13, 2021. R:1-1:3, 13-14; R:158-1:43. While the Agreement was "not contingent" on Kalonymus' obtaining financing, it did not prohibit Kalonymus from purchasing the Property with financing. R:1-1:12-13. Section 6.14 of the Agreement provided "[t]ime shall be of the essence with respect to the Closing and all obligations of the parties hereto," expressly indicating the importance of the transaction closing timely. R:1-1:17.

Appellants' mortgage on the Property was to be paid off and released by the closing date, as the Agreement required Appellants to deliver clean title:

- Section 3.1(k) requires "[a]n Affidavit of Seller, attesting that Company has good and marketable title to the [Real] Property, subject only to current taxes and the existing mortgage to be satisfied out of the Closing proceeds at Closing." R:1-1:4.

- Section 3.1(l) requires "[a]n Affidavit of Seller, attesting that Company is the owner of all of the lessor's right, title, interest and benefits in, to and under the Leases, free and clear of all liens and

2

encumbrances, save and except for the existing mortgage to be satisfied as aforesaid." R:1-1:4.

In addition, Appellants agreed to certain express Mortgage-specific representations and warranties to "induce[] . . . [Kalonymus] to enter . . . [the] Agreement" (R:1-1:5):

  •    Section 4.4(d): Best Peacock Inn "has good, marketable and insurable title to the real property and Improvements, and the [Real] Property is free and clear of all liens, encumbrances and claims, save and except for the existing mortgage to be satisfied." R:1-1:6.

  •    Section 4.3: "[t]he execution, delivery and performance of this Agreement and all other documents, instruments and agreements by Seller executed in connection herewith, and the consummation by Seller of the transactions contemplated hereby, does not and will not: (i) constitute a violation of or default under (either immediately, upon notice or upon lapse of time) any provision of any contract, agreement or other instrument to which Seller or Seller's assets may be bound." R:1-1:5.

  •    Section 4.4: "(c) [n]either the Seller nor the Company is/are a party to any written or oral . . . (vi) contract or indenture that, with the giving of notice or the passage of time, could result in an encumbrance on the [Real] Property, save and except for the existing mortgage to be satisfied as aforesaid." R:1-1:6.

Section 8.2 contemplated if Appellants breached the Agreement, Kalonymus had the following recourse:

  In the event of a default by Seller under the terms of this Agreement, Buyer shall have the sole and exclusive remedies of either (i) terminating this Agreement and receiving the return of its Deposit, whereupon all parties hereto shall be released and relieved from any and all further liability or obligations hereunder; or (ii) proceeding to enforce this Agreement by an action for specific performance, as Buyer shall thereby, without waiving Buyer's right to recover any and all

3

losses, damages, costs and expenses resulting from Seller's default. Notwithstanding anything to the contrary herein contained, in the event of an intentional willful failure of Seller to perform any matter reasonably within its control or in the event any of the warranties and representations made by Seller herein shall be in any material respect inaccurate or there is an omission of a material fact necessary to make any representation of Seller not misleading in light of the circumstances under which it was made, Buyer shall have any and all remedies available to Buyer under the laws of the State of Florida.

R:1-1:20.

On September 8, 2021, the parties signed a First Amendment to the Agreement, making the new closing date on or before October 8, 2021 (which date was later extended to October 22, 2021) to allow for a longer inspection period and changing the purchase price to $5.15 million. R:77-4; R:168-1:144; R:158-1:37.

## III.    APPELLANTS' BREACH OF THE AGREEMENT.

In October 2021, the title company sent out documents ahead of closing, including requesting the payoff affidavit relating to Appellants' mortgage. R:77-5. On October 12, 2021, Appellants advised Kalonymus that Appellants' lender would not provide a payoff letter and a satisfaction of the mortgage until January 1, 2022 and not after March 31, 2022. R:77-6; R:77-7; R:137:2; R:158-1:43. Appellants asserted that they were "unaware of the limitation," but that "[b]ecause of this restriction, [Appellants] were unable to close as required by the Agreement." R:137:2.

Without the mortgage being paid off and released by the closing date, Appellants would not be able to deliver clear title and comply with the title commitment requirements in the Agreement. R:1-1:4-5. Appellants' lender offered to allow Appellants to pay off the mortgage early (that is, in October 2021) to avoid Appellants' breaching of the Agreement, in exchange for $200,000 to cover the capital gains exposure for the early payoff, but Appellants refused to do so. R:158-1:7; R:77-1:14. Accordingly, Appellants failed to close and breached the Agreement.

On October 28, 2021, Kalonymus sent a letter to Appellants stating they were in material default of the Agreement. R:159-6:5-6. Appellants also were informed their "breaches and misrepresentations have resulted in [Kalonymus] suffering and continuing to incur significant losses and damages" because Kalonymus "had to delay its financing resulting in increased transaction fees as well as substantial losses related to the terms of the loan, including a material increase in interest rate." R:159-6:6. In addition, Appellants were told their "breaches and misconduct are a direct cause of the damages that [Kalonymus] . . . sustained." *Id*. Finally, the delay in closing resulted "in lost rental income." *Id*.

Kalonymus contacted Appellants again on November 12, 2021, "in an effort to resolve [Appellants'] default" under the Agreement and offered two resolution options: first, "in exchange for credit at closing of $750,000, [Kalonymus] will close at such a time as [Appellants'] lender will accept the loan payoff and deliver a

5

satisfaction of mortgage so that [Appellants] can deliver clean title and satisfy the title commitment requirements set forth in the [Agreement]"; or second, Kalonymus was "willing to terminate the [Agreement] in exchange for a payment from [Appellants] of $1,000,000 and mutual general releases." R:159-6:3. Kalonymus reiterated that Appellants' breach and misrepresentations resulted in Kalonymus' "incurring, and continuing to incur, significant losses and damages," because Kalonymus "had to delay its financing, resulting in increased transaction fees as well as substantial losses relating to the terms of the loan." R:159-6:4. Kalonymus noted that the "delay in closing also result[ed] in lost rental income Kalonymus would otherwise have been realizing." *Id*. The correspondence made plain that if Appellant were unwilling to pursue either of the options proposed, then Kalonymus would pursue an action against Appellants for specific performance and damages. *Id*.

On December 20, 2021, Kalonymus filed its four-count complaint (*see* R:11-2:10-18), which Kalonymus' counsel provided to Appellants' counsel the following day. R:159-5:2. Counsel for Appellant stated she was "not authorized to accept service on their behalf" and asked that Kalonymus' counsel give her a call. R:159-5:1. In a later email from December 21, 2021, Appellants' counsel stated Appellants were "ready[,] willing and able to close on January 2, 2022 if your client so wishes." *Id*.

On January 5, 2022, Appellants' counsel sent an email to Kalonymus' counsel which attached "signed documents for the transfer of the shares" and asked that Kalonymus' counsel "advise how [Kalonymus] want[ed] to proceed." R:159-6:1. Counsel for Kalonymus stated, "Buyer is ready, willing, and able to close, but only after Sellers satisfactorily addresses Buyer's demands as set forth in [the] November 12, 2021 letter." *Id*. Specifically, Kalonymus noted that Appellants had failed to address the default or lawsuit filed, and that Appellants "cannot simply reset the closing date in the hopes of resolving the various defaults." *Id*.

## IV.  THE DISTRICT COURT PROCEEDINGS.

### A.  The Pleadings.

On December 20, 2021, Kalonymus filed a four-count complaint in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, which sought relief for: specific performance, breach of contract for failure to close, breach of express warranties and representations, and negligent misrepresentation, and consequently, the damages incurred because of Appellants' breach. R:11-2:10-18. On March 8, 2022, Appellants filed their action in the district court, asserting a single count for a declaratory judgment. R:1. Appellants amended their complaint on March 17, 2022 (R:8), and sought to remove Kalonymus' action to the district court on March 23, 2022. R:11-2:2-5. The two actions were consolidated in the district court. R:12; R:13.

7

Kalonymus moved to dismiss Appellants' amended complaint because, among other reasons, the requested declaratory relief solely focused on wrongs that already occurred and were duplicative of the breach-of-contract issues raised in Kalonymus' complaint. R:11.[1] In response, Appellants argued they were entitled to maintain an independent cause of action as the claims raised factual and legal issues beyond those in Kalonymus' complaint and concerned an ongoing controversy. R:24. Kalonymus replied in support of the dismissal motion. R:28.

The district court granted the dismissal motion. R:92. The court found Appellants' "declarations focus on actions taken by the parties in the past: [Appellants'] failure to close by October 8, 2021"; Kalonymus' "election, after October 8[, 2021], to proceed with the [A]greement"; Kalonymus' "refusal to consummate the [Appellants'] proposed purchase in February 2022 unless [Appellants] agreed to a lower purchase price"; Appellants' "election to terminate the agreement"; and Appellants' "decision to retain [Kalonymus'] deposit." R:92:5. "Accordingly, the damages [Kalonymus] suffered, which [Appellants] would like the [c]ourt to declare were caused by [Kalonymus'] own actions, have already occurred, as has the breach which [Appellants] accuse [Kalonymus] of." *Id*. The court determined the parties "already have chosen a course of action, come what

---

[1] Kalonymus moved to strike paragraphs 30 and 33 as immaterial and inadmissible. R:11:9-11.

may," such that "a declaration from the [c]ourt, regarding these past controversies, will do nothing to 'prevent the accrual of avoidable damages.'" *Id*.

The court dismissed Appellants' amended complaint as they "are not entitled to the declaration of rights they request." R:92:6.

### B.    Appellants' Summary Judgment Motion.

As to Kalonymus' causes of action, Appellants moved for summary judgment. R:36:3-9 (Appellants' Motion). Specifically, Appellants argued: (i) the delay in closing did not result in the termination of the Agreement because Kalonymus sought to purchase the Property and remained bound by the terms; (ii) Kalonymus breached the Agreement by failing to perform in January and February 2022; and (iii) Kalonymus' breaches mooted any damages caused by Appellants failure to close in October 2021. R:36:4-7.

In response, Kalonymus argued summary judgment was inappropriate as Appellants failed to "address, much less mention" the elements of the four claims. R:41:3. Kalonymus also asserted that Appellants' substantive arguments failed because they relied on a "fundamental mischaracterization of the events" and flawed legal positions. R:41:12-20. Finally, Kalonymus argued that Appellants relied on confidential settlement communications as support for their position that Kalonymus breached the parties' Agreement. R:41:1-3, 10-12.

The district court denied Appellants' Motion, finding Appellants "failed to carry their burden" because Appellants' Motion was "wholly superficial" and "fail[ed] to expressly even mention any of the four specific counts" brought by Kalonymus, "never mind address whether there are genuine issues of material fact as to the elements of those counts." R:93.

### C.    Kalonymus' Summary Judgment Motion.

Kalonymus also moved for summary judgment on its claims (Kalonymus' Motion). R:78. As to its breach of contract claim, Kalonymus argued it was entitled to summary judgment because: (i) the parties had a valid contract, (ii) Appellants breached the Agreement by failing to close in October 2021, and (iii) Kalonymus was damaged by this breach. R:78:11-14. As to the negligent misrepresentation claim, Kalonymus asserted it detrimentally relied upon Appellants' misrepresentations (which Appellants conceded they made), including falsely representing that they could close in October 2021, resulting in damages. R:78:14-15. Finally, Kalonymus argued that none of Appellants' affirmative defenses precluded entry of summary judgment. R:78:15-20.

In opposition, Appellants asserted that Kalonymus cannot prove the essential elements of its claims. R:84. Appellants argued Kalonymus' breach of contract claim failed as it could not establish injury or damages because "Kalonymus reaffirmed and then repudiated" the Agreement, "thereby nullifying its claims." R:84:5.

Appellants also claimed that even if Kalonymus could prove injury or damages existed, those injuries and damages would have been incurred by a third party. R:84:8-11. That is, because Kalonymus had planned to assign its rights to the Property to a different entity, and Kalonymus did not intend to be the "buyer or the borrower," Kalonymus did not have the legal right to enforce the Agreement as it "was never going to be the buyer." R:84:8-9.[2] Finally, Appellants asserted Kalonymus was not entitled to damages—including "increased 'cost of capital', duplicative administrative fees, or inferior tax treatment" because Kalonymus failed to mitigate its damages. R:84:10-11. As to Kalonymus' negligent misrepresentation claim, Appellants argued that "because it [was] expressly premised on an alleged false promise to perform under a contract in the future," it must fail. R:84:11-12. Appellants asserted Kalonymus' negligent misrepresentation claim is the same as its breach of contract claim and therefore any relief lies in contract, not tort. R:84:12.

Kalonymus replied that Appellants' response was "fatally flawed." R:88. First, there was no legal basis to support Appellants' assertion that Kalonymus breached the Agreement when it did not close on the date Appellants unilaterally selected. R:88:6. Second, Appellants failed to adequately address their failure to cure

---

[2] Appellants also argued that, even if the assignment had not taken place, Kalonymus intended to move forward with the assignment at closing, which would have led to the same result—that Kalonymus would not have been the buyer. *Id.*

the damages suffered by Kalonymus as required by section 8.2 of the Agreement. R:88:4-10. Third, Kalonymus did not assign its rights in the Agreement and was the party damaged by Appellants' default. R:88:7-10. Kalonymus also explained that Appellants mischaracterized its negligent misrepresentation claim. R:88:10-11. Finally, Appellants failed to address the arguments directed to Appellants' affirmative defenses, thereby abandoning those arguments. R:88:11.[3]

## V.    THE OMNIBUS ORDER.

The district court issued its Omnibus Order, which granted in part and denied in part Kalonymus' Motion. R:137. The court found Kalonymus was "entitled to judgment in its favor as to its request for specific performance and [Appellants'] liability on its breach-of-contract claims as set forth in counts one through three of its complaint." R:137:18. However, the court found Kalonymus' "motion insufficient to establish its entitlement to judgment as to either the amount of monetary damages to be awarded or its claim for negligent misrepresentation in count four of its complaint," and ordered a bench trial be held as to Kalonymus' damages. *Id.*

---

[3] Appellants sought leave to file a sur-reply to address the Kalonymus' arguments related to Appellants' affirmative defenses, which Kalonymus opposed and the district court denied. R:94-96.

### A.    Kalonymus' Breach of Contract Claims.

As to the breach of contract claim, the court found Kalonymus established its entitlement to summary judgment. R:137:5-16. The court determined there was "no real dispute" as to the first two elements of the claim, whether the parties had a valid agreement, and Appellants, "by their own acknowledged fault, were unable to close in October 2021" thereby "breach[ing] the contract." R:137:5. The court stated the "parties' views diverge . . . at the damages element" but also recognized that Appellants "do not deny that damages, generally, resulted from their breach." *Id*. The court found Appellants failed to show Kalonymus excused Appellants' default or Kalonymus breached the Agreement "because there [was] no support for [Appellants'] claim that [Kalonymus] ever reaffirmed the contract, post [Appellants'] default, there is no way the [c]ourt could conclude that [Kalonymus] itself then committed its own material breach." R:137:5-7.

The court dismissed Appellants' argument that Kalonymus was not in any way damaged by Appellants' breach. R:137:7-11. The court ruled that Appellants waived any argument regarding whether Kalonymus (or another entity) was the ultimate purchaser of the Property by not raising the issue earlier. R:137:8. But, even if Appellants had not waived this argument, the court found Appellants' "arguments as to the assignment legally, factually, and conceptually infirm." *Id*.; R:137:8-11. The court recognized there was no evidence that the assignment was executed—in

13

fact, the district court highlighted evidence that it was not assigned. R:137:8-11. The court concluded "that regardless of which entity was ultimately going to take ownership" of the Property, Kalonymus "did not receive the benefit of its bargain and was, therefore, damaged as a result of the breach." R:137:11.

### B.    Kalonymus' Damages.

"Although the [c]ourt ha[d] no difficulty concluding that [Kalonymus] proved it was damaged by [Appellants'] breach," the court found "the parties' dispute regarding the amount of damages that should be awarded is not so straight forward." R:137:11. The court determined, "[t]here appears to be no real dispute, thus far, that what [Kalonymus] will receive in 2023, as compared to what it would have received in 2021, is less advantageous, ultimately denying [Kalonymus] the full benefit of its bargain—at least to some extent." R:137:15-16. The question for the court as to "[h]ow that 'less advantageous' posture translates into actual monetary damages due to [Kalonymus] remains to be seen; but the [c]ourt has no difficulty concluding, even without an expert opinion, that those damages are something greater than zero." R:137:16.

### C.    Kalonymus' Negligent Misrepresentation Claim.

As to the negligent misrepresentation claim, the court denied summary judgment as "[a]ll the identified misrepresentations 'simply ha[ve] to do with [Appellants] failure to perform under the contract.'" R:137:16 (citing *Island Travel*

*& Tours, Ltd., Co. v. MYR Indep., Inc*., 300 So. 3d 1236, 1239 (Fla. Dist. Ct. App. 2020)). The court also found Kalonymus failed to demonstrate any distinct damages relating only to the negligent misrepresentation claim. *Id*.

**D.    The Damages Trial.**

The district court held a two-day non-jury trial on September 11 and 12, 2023 (Damages Trial). R:168-1; R:168-2. Kalonymus' first witness was Maximilian Zeff, Kalonymus' Founder and CEO. R:168-1:40. As the owner of Kalonymus, Zeff testified that he negotiated the loan terms and the structure of the deal. R:168-1:46. Zeff stated the purchase price was adjusted from $5,450,000 to $5,150,000 because, over the course of due diligence and based on reports received, "there were some outstanding maintenance items, and that the investment wasn't going to be as strong as it was before." R:168-1:44-45. He also testified that in October 2021, Kalonymus was going to pay the purchase price "through roughly 50 percent debt and 50 percent in cash." R:168-1:45. Of the cash portion, "[a] small portion of the cash was going to come from Kalonymus, but the large majority was going to come from another entity." *Id*. As for the loan component, "[t]he single-purpose entity that was taking ownership to the assets was ultimately going to be named in the loan." *Id*.

Regarding the corporate structure involved with the purchase of the Property, Zeff explained, "[i]t's standard practice in real estate deals to assign the interest and create a single-purpose entity to take ownership of any asset," and this is done to

reduce liability, for tax and estate planning purposes, and efficiency with the loan. R:168-1:45-46. The title to the Property would have been that of the special-purpose entity (SPE), which would purchase the membership interest in Best Peacock Inn, which would then be amended and ownership would be taken by a single-purpose entity. R:168-1:46. 3667 Poinciana, LLC was the entity created in October 2021 to take ownership of the Best Peacock Inn, whose members are RDZ Family, LLC and Zeff as an individual. R:168-1:46-47. RDZ Family, LLC is a Delaware-based trust for which Zeff is the beneficiary and uses for his real estate deals outside of California. R:168-1:47-48. This structure was devised based on "very sophisticated estate-planning and tax-planning," and counsel's advice. R:168-1:49. Notwithstanding this plan, Zeff testified the "assignment from Kalonymus to those SPEs was not executed" because Appellants "defaulted." R:168-1:50. Therefore, the "two [SPEs] [n]ever t[ook] assignment of Kalonymus's interest" in the Agreement. R:168-1:51.

Zeff testified as to Kalonymus' damages. R:168-1:54-63. First, regarding the market differences that occurred between October 2021 and January 2022, Zeff testified, "[I]nterest rates ha[d] gone up and were going up, and are going up still to this day significantly and quickly." R:168-1:54. The market changes "create[d] a volatile investment environment where the cost of capital was increasing," such that

16

"the types of returns and the amount of return an investor was demanding for their cash was higher because of the environment." R:168-1:54-55.

> Zeff further testified:
>
> As interest rates rise, which is a function of both generally the Treasury going up, as well as investor spreads increasing over that, essentially, the cost of that debt is increasing. So the proceeds are reducing, because the size of the loan sized is based off of the cost of the debt compared to the income of the property. So the size of the loan is reducing. It's more expensive to borrow. And then another factor of increasing interest rates is that the cost of equity, which -- meaning the investment dollars, the cash that would go into it, are also going up. . . . [T]he cost of everything is going up. Kind of similar to inflation. But debt is generally a lower risk category than equity. So equity needs to spread over debt, and debt needs to spread over the risk -- riskless investment of the U.S. Treasury.

R:168-1:56. Accordingly, Kalonymus was "damaged by the increased cost of debt and the increased cost of equity." R:168-1:55.

Second, Zeff explained there also was a reduction in the benefit of the depreciation and lost income, because of the "sunsetting provision from the 2017 Jobs and Tax Act that reduced from 100 percent to 80 percent in 2023, and will reduce again in 2024 to 60 percent." *Id*.

Third, Zeff testified there was "lost income from the property if [Kalonymus] had closed in October" as the Property "is generating cash flow, and [Kalonymus] would have been on the receiving end of that cash flow if [Kalonymus] had closed in October." *Id*.

17

Finally, to close, Kalonymus would have had "to replicate a bunch of the due diligence studies [it] did," including a seismic study, an environmental study, an ATLA study and a property condition assessment report, incurring additional costs. R:168-1:55-56. The due diligence studies were "procured by Newmark initially, [who was the] broker for the loan, and then [Kalonymus] reviewed them, as well, for our own due diligence. But ultimately, when the transaction didn't close, the [costs] were incurred by Kalonymus." R:168-1:56-57.

When asked to compare the deal in October 2021 versus January 2022, Zeff explained the deal was not as favorable in January 2022, as it would have been in October 2021 (R:168-1:57):

> Interest rates had already gone up and were starting to increase in how fast they were going up. The market was getting shaky. . . . [T]he investment environment was uncertain and more volatile. People didn't know what was going to happen. Transaction volumes were falling. And there was just a lot of uncertainty in the market. And so as those interest rates were going up, they were starting to go up faster and faster compared to the environment over the summer until October, where it was a little more stable.

*Id*.

Zeff also explained that although the value of the Property may have "increased relative to the amount of money that you have to borrow to purchase it at that lower price," that would not change the economics of the debt versus equity ratio numbers. R:168-1:62-63. Specifically, "the lender only looks at the cash flow, and they don't consider" the market in Miami versus another location. R:168-1:63.

18

As to the parties' interactions post-October 2021, Zeff testified that he presented offers to close to Appellants, which involved credits "in an effort to try to resolve this default." R:168-1:58. Zeff's "various offers" were an attempt "to resolve the damages in the default at hand from a business perspective" to avoid litigation. R:168-1:58-59. The offers Zeff made "were twofold: one, you know, to try to actually get to a resolution, but also to bring them to the table. They were really hard to get ahold of. They refused to acknowledge that there were any damages and often would not respond to us at all." R:168-1:59.

Regarding the damages amount, Zeff testified he "did some of the same calculations based off of the increasing interest rate, where . . . I was wondering if it could be . . . in the future, there was also [the fact that] . . . we need[ed] 60 days to go do these new reports and see if we could go get a new loan." R:168-1:59. Zeff:

> assess[ed] some amount of damages that would have had to do with the uncertainty of the more rapidly -- and volatile market and the rising interest rates. But also . . . we had initially packaged this loan together with multiple assets, and we no longer had the benefit of that. So there was also uncertainty about what type of loan were we even going to be able to get. We certainly couldn't put it in the same category as we had before.

R:168-1:59-60.

Zeff explained the numbers were not "final, hard numbers," but rather numbers "to try to get them to the table . . . to start a negotiation." R:168-1:61. Appellants' "refusal to even engage was challenging," so "part of the increasing

amounts was to essentially try to get them to the table so that they could understand that the damages were increasing, and, hopefully, we could then come to a mutually agreed-upon resolution through a negotiation." *Id*. Ultimately, if the deal were to occur, Zeff testified, "damages [are] required to make [the] deal financially feasible" "because the market has changed" and "investors require a higher return for their capital, and the cost of debt is essentially double what it was in October of 2021." *Id*.

When asked whether he could have closed in January 2022, Zeff testified that, "the scenario to which we could have closed in January would have been if the damages addressed the risks that we were then taking on – there would have been a cost to it – to proceed without updating the reports, to proceed without a loan," so "from a business perspective, we could have negotiated a resolution that would have been satisfactory" to Zeff. R:168-1:100. But Kalonymus "never agreed to a January 2022 [closing] date." R:168-1:103. And would not have until the "breach of reps and warranties, or damages or default w[ere] addressed." R:168-1:101.

The evidence also shows Kalonymus was "ready, willing and able to close, but only after [Appellants] satisfactorily addressed [Kalonymus'] demand as set forth in its November 12th, 2021 letter." R:168-1:104. Zeff stated the same was true as to Appellants' attempts to close on the Property in February 2022; Appellants

20

unilaterally picked the closing date and wanted Zeff "to close without acknowledging any of the damages or the default." R:168-1:112-113.

On cross-examination, Zeff explained Kalonymus had planned to assign the Agreement to 3667 Poinciana, LCC and Poinciana, LLC, but never did because Appellants breached the Agreement. R:168-1:66-67. Notwithstanding that the assignment never occurred, Zeff was questioned at length about what the ownership shares would have been if the assignment had taken place and the sale of the Property occurred. R:168-1:69-82. As the sale never took place, neither did the assignment, and Kalonymus, which Zeff controlled, remained the buyer. R:168-1:82.

The next witness was Kalonymus' expert, Paul Habibi, who provided unrebutted testimony concerning the economic damages Kalonymus suffered due to Appellants' failure to close in October 2021. R:168-1:146.[4] Habibi explained there were five categories of damages:

---

[4] Appellants' expert witness was excluded because her opinions were found to be "unsupported and conclusory and any remaining opinions unhelpful, offering nothing beyond the understanding of the average lay person." R:142:2. Appellants do not challenge this on appeal, thereby waiving the issue. *Sapuppo v. Allstate Floridian Ins. Co*., 739 F.3d 678, 681 (11th Cir. 2014) ("[a] party fails to adequately brief a claim when he does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to those claims" (internal quotation marks omitted)); *accord Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012); *United States v. Willis*, 649 F.3d 1248, 1254 (11th Cir. 2011).

The first and largest category is cost-of-capital damages, which represent "the damage to Kalonymus and its affiliates as a result of a much more challenging capital markets environment on both the debt side, as well as the equity side." R:168-1:153-154. Habibi further testified that rising interest rates directly impact the cost of debt because "[i]t increases the cost of debt, because as the rise in interest rates escalates, assuming that you hold the spread constant – or the spread sometimes is also raising during that time frame – you'll see a net effect of increasing borrowing rates across the market." R:168-1:157.

To calculate this, Habibi testified that he took Newmark's quote and "added the spread to the risk-free rate to arrive at a total interest rate of 3.35 percent, had the deal closed in October of 2021." R:168-1:157-158. Habibi stated, "the ten-year Treasury has gone from 1.46 percent in October of 2021 to 4.26 percent." R:168-1:157. "[T]he spread on that available debt has gone up during the same time frame from 1.89 percent up to 2.5 percent. So the net effect is that the interest rates have gone up from 3.35 percent in October of 2021 to 6.76 percent as of the current time frame, so roughly double interest rates, almost exactly." R:168-1:157-158. Simply put, "cost of capital is really the holistic concept that captures the cost of debt . . . as well as the cost of equity, which is the second component." R:168-1:158.

Habibi noted that "[t]he cost of equity . . . skyrocketed" and "the cost of equity in October of 2021 was 5.56 percent, and today it's roughly 12 percent." R:168-

1:158-159. "[T]oday's borrowing costs are 6.76 percent. The expectations on equity returns are 12 percent. So now they're almost twice what the cost of debt is, which is another way of saying that because equity investors are last in line behind the payments of debt, they expect a higher rate of return to compensate them for that risk." R:168-1:159.

In this case, "cost of capital has made this deal much less attractive [post-October 2021], because as the rates of return on both debt and equity have gone up, the expected or required rate of return to all the providers of capital has escalated," which means "everybody should be willing to pay less for that same stream of projected benefits." R:168-1:160. Accordingly, Habibi testified that the cost-of-capital damages was $2,346,638. R:168-1:164-166.

The second category is "lost profits related to [Appellants] inability to own the [Property] from the date of the alleged breach through September 8th of 2023," including "debt service." R:168-1:154. "So in a but-for world where [Kalonymus] would have been able to close on the transaction in October of 2021 through [the trial], this represents the lost cash flow to that equity that Kalonymus would have received." *Id*. Habibi testified that the damages for lost profits was $175,028. R:168-1:167.

The third category "reflects a higher interest rate on the broader portfolios under the master credit agreement," which "adds roughly $87,210 to damages."

23

R:168-1:154. Because the Property "was packaged up in a credit facility with other properties," it would be "cross-collateralized," thus providing more favorable loan terms. R:168-1:169-170.

The fourth category "is duplicate expenses that would have to be paid repetitiously as a result of having a different closing date, multiple reports and legal expenses," which totaled $50,650. R:168-1:154, 172.

Finally, "lost tax savings," which "relates to the provision in the 2017 tax act which allows for bonus depreciation," now "partially phased out," caused damages of $14,217. R:168-1:154-155, 173.

Habibi testified that the "aggregate damages of all the five categories amount[ed] to $2,673,742" and Kalonymus could not "go to the debt market [in September 2023] and . . . put this deal back together" under October 2021 terms as it was more difficult for entities to borrow money now. R:168-1:166-167, 174.

When asked which entity was affected by Appellants' failure to close, Habibi explained, "it's really Kalonymus that's affected, because it is the entity with the opportunity to bring in that investor," and "it has experienced harm because it can no longer attract that investor at the same cost that it did prior." R:168-1:203-204. "Kalonymus is left holding the bag on economic harm, because it needs to give any of its investors a higher rate of return on the equity, meaning they'll pay less for it," and "Kalonymus specifically has been harmed, because it can't assign that escrow

at the same terms and conditions that it could have" in October 2021. R:168-1:204-205. Habibi concluded, "the economics of this deal, as they were negotiated in October of 2021 in a more favorable environment, have definitely changed," which is what Habibi's "damages calculations contemplate, is the loss in project economics to the investor as a result of a delay in the closing." R:168-1:214.

Appellants called Francisco Lagos Marmol as their first witness. R:168-1:215. Marmol explained that even though he was a 50% owner of Best Peacock Inn and signed the financing papers, he didn't realize that the mortgage papers restricted when the Property could be sold. R:168-1:219-220. Marmol conceded Appellants "breached the . . . [A]greement [because] [they] were unable to close in October 2021" but Appellants did try to close three times after October 2021 and found Kalonymus' "demands . . . unreasonable for what we thought in numbers." R:168-1:222-223. Marmol admitted that Appellants unilaterally selected the January 2022 closing date. R:168-1:223. Marmol also testified that Appellants were "willing to finance the purchase of the shares under the exact terms that Newmark was willing to finance it at back in October of 2021," but that offer was never conveyed to Kalonymus. R:168-1:225-226, 235.

Marmol admitted that "when you buy a property here, you do it under an LLC" as that is the "way [he has] done it in the last 15 years." R:168-1:227. Marmol also admitted he did not know how Kalonymus "would structure" the closing of the

Property, but that there was nothing in the Agreement "that prohibit[s] Kalonymus from securing financing to close this transaction." R:168-1:228-29, 235. Additionally, Marmol admitted he never offered any "concrete numbers to Kalonymus to close th[e] [P]roperty in January of 2022." R:168-1:236.

Appellants also called Lisette Salazar, Appellants' real estate attorney. R:168-1:237. Salazar sent a letter to Kalonymus' counsel in December 2021 concerning the possibility of closing on January 2, 2022, and in January 2022, Appellants "went ahead and [] signed all of the documents that had previously been agreed to" because Appellants "wanted to close." R:168-1:244-245. Kalonymus' counsel responded that, "buyer is ready, willing and able to close, but only after seller satisfactorily address buyer's demand as set forth in its November 12th, 2021 letter." R:168-1:247. Salazar also admitted that the January 2022 communication was to let Kalonymus' counsel know "[Appellants] were ready to close" but that "particulars, obviously, would have to be worked out." R:168-1:256. These "particulars" included numerous documents that were required to close that Appellants had failed to provide or prepare, and that were not approved or finalized by Kalonymus. *See* R:168-1:252-257 (conceding Appellants failed to provide Kalonymus with corporate minute book, certificate of incumbency, copy of certificate, articles of organization, certificate of good standing, affidavit attesting to rents, security deposits, and prepaid rents, and settlement statement).

26

Next, Fernando Carlos Van Peborgh admitted Appellants breached the Agreement as they were unable to close in October 2021. R:168-1:262. Van Peborgh stated Appellants were open to addressing the damages Kalonymus had suffered, but not until "[a]fter the closing." R:168-1:265-266. Van Peborgh testified that Appellants were "willing to finance the purchase of the shares under the exact same terms that Newmark was willing to finance it back in October 2021," but conceded that offer was never made to Kalonymus. R:168-1:267, 268-269. As to the Agreement's amendment, Van Peborgh testified "that the purchase price was reduced from [$]5.4 to $5.1 million and signed by Mr. Marmol on behalf of himself and Best Peacock Inn, LLC," and though it was not signed by him, Marmol "must have told [him] or he must have asked me for that reduction of price" and Van Peborgh assumed that he agreed to it. R:168-1:271-272.

The next day, the court recalled Habibi to "calculate what the deal would look like and what the damages would look like, assuming [Appellants] were going to finance the transaction under the same terms that Newmark was giving to [Kalonymus] in October of 2021." R:168-2:6. Per Habibi, by the Appellants' financing the closing at the terms offered by Newmark in October 2021, the damages were:

- Cost-of-capital damages were reduced from $2,346,638 to $1,322,850;

- All other damage computations remained the same.

R:168-2:6-7. The total damages would therefore be $1,649,955. R:168-2:7.

### E. Verdict and Order Following Non-Jury Trial.

On September 27, 2023, the district court issued its Verdict and Order Following Non-Jury Trial (Verdict), in which it again found in favor of Kalonymus on its breach of contract claims and, in addition to specific performance, found Kalonymus established entitlement to $1,553,245 in damages. R:162:50.

The court addressed the "structure and interrelatedness of other individuals and entities involved in Kalonymus' side of the transaction." R:162:3-4. The court recognized "two other entities were created in anticipation of the closing on Best Peacock [Inn]," *i.e.*, "3667 Poinciana LCC, composed of two members: Zeff (as .01% owner) and RDZ Family, LLC (as 99.99% owner)" and "Poinciana LLC, whose sole member is Zeff." R:162:3. The court recognized that "simultaneous to the closing on Best Peacock," Kalonymus "intended to transfer its interests in the Agreement to the Poinciana Entities" but "because the closing was never consummated, Kalonymus never executed the assignment." R:162:3-4.

The court found Kalonymus proved "all the elements of its breach-of-contract claim, including that it is entitled to specific performance and was damaged as a result of [Appellants'] breach." R:162:6. As "Kalonymus never assigned its rights

in the Agreement" to the Poinciana Entities or any other SPE, "the benefit of the bargain that was struck in the Agreement belonged to Kalonymus and not any other entity." *Id*. Therefore, Kalonymus was "entitled to an award of damages in order to receive the benefit of the bargain had the Sellers not breached the Agreement and had the parties closed in October of 2021." R:162:6. Accordingly, the court determined Kalonymus established $1,553,245 in damages. *Id*.

The court also found that Appellants "never made any specific offer to pay for Kalonymus' damages prior to their proposed closing dates in January and February 2022," and "Kalonymus asked for . . . inflated damages does not equate to it[] acting in bad faith or failing to mitigate its damages." *Id*.

Finally, the court recognized, for the first time at trial, "both Marmol and Van Peborgh offered to finance the credit portion of the transaction under the same terms Newmark had offered in October 2021." R:162:5. Thus,

> [a]ssuming [Appellants] are ready, willing, and able to fulfill their pledge to finance the transaction under the same terms Newmark had offered in October 2021, and based on the credible evidence presented, the [c]ourt concludes that Kalonymus established damages resulting from the breach in the amount of $1,553,245. If [Appellants] fail to adhere to their commitment, however, the total damages [are] increased by $1,033,288, thus resulting in a total of $2,586,533.

R:162:6.

### F.    The Final Judgment.

The district court entered a Final Judgment and "reiterated [Kalonymus']
entitlement to specific performance, based on a sale price for the [P]roperty of
$5,150,000, while also awarding damages to [Kalonymus]: in the amount of
**$1,553,245**, if [Appellants] ma[d]e good on the financing terms they pledged as
outlined in the verdict or $2,586,533, if they don't." R:163:1. The court ordered the
parties to close on the Property on or before November 27, 2023, which the parties
did. R:163:2.

## VI.    STANDARD OF REVIEW.

This Court reviews the trial court's summary judgment orders *de novo*,
applying the same legal standards as the district court. *Copeland v. Georgia Dep't
of Corr.*, 97 F.4th 766, 774 (11th Cir. 2024). This Court "may affirm summary
judgment on any ground that the record supports." *Buckley v. Sec'y of Army*, 97 F.4th
784, 792 (11th Cir. 2024) (citation omitted).

"After a bench trial, [this Court] review[s] the district court's conclusions of
law *de novo* and the district court's factual findings for clear error." *Tartell v. S. Fla.
Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015) (citation omitted).
"A factual finding is clearly erroneous if, after viewing all the evidence, we are left
with the definite and firm conviction that a mistake has been committed." *Id.*
(citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 52(a)(6)

("[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility").

Finally, whether a court applied the correct measure of damages on a breach-of-contract claim is a question of law that this court reviews *de novo*. *Del Monte Fresh Produce Co. v. Net Results, Inc*., 77 So. 3d 667, 673 (Fla. Dist. Ct. App. 2011). If the trial court employed the correct measure of damages, this Court reviews the damages award for support by competent, substantial evidence. *Id*.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's Final Judgment in all respects. First, the evidence supports the entry of summary judgment in favor of Kalonymus' specific performance and damages claims. The evidence is undisputed that Appellants breached the Agreement (which they concede), damages occurred because of the breach, and Kalonymus was ready, willing and able to perform under the terms of the Agreement at all relevant times. There is no evidentiary or legal support for Appellants arguments to the contrary—only Appellants' speculation as to what might have occurred had they not breached. But conjecture does not provide a basis for reversal and, therefore, the district court's Omnibus Order should be affirmed.

Second, Kalonymus complied with Section 8.2 of the Agreement, which allowed it to bring an action for specific performance and recover its damages that resulted from Appellants' breach. Contrary to Appellants' argument, the Agreement does not allow Appellants to unilaterally set closing dates and require Kalonymus to close on those dates or breach the Agreement. As the district court correctly found, this argument is unavailable and there is no support that Kalonymus committed a material breach.

Third, the amount of damages awarded by the district court is fully supported by the record and trial testimony. Kalonymus' expert, Paul Habibi, provided unrebutted testimony concerning the economic damages Kalonymus suffered due to Appellants' failure to close, and Maximilian Zeff, Kalonymus' Founder and CEO, testified as to the financing for and corporate structure of this transaction. The record does not provide any support for Appellants' assertions to the contrary.

Finally, Appellants failed to prove Kalonymus' damages should be reduced under the doctrine of avoidable consequences as the testimony establishes that Kalonymus could not have reasonably avoided the consequences that Appellants set into motion by breaching the Agreement.

**ARGUMENT**

## I.    THE DISTRICT COURT CORRECTLY FOUND KALONYMUS WAS ENTITLED TO SPECIFIC PERFORMANCE AND DAMAGES.

Under the terms of the Agreement, Kalonymus, as the non-breaching party, was entitled to both specific performance and damages due to Appellants' breach. R:1-1:20-21. Kalonymus was required to prove: (1) it was clearly entitled to such relief; (2) it lacked an adequate remedy at law; and (3) justice required such relief be granted. *Anoushfar v. Lexington Ins. Co.*, No. 21-11244, 2021 WL 4848073, at *7 (11th Cir. Oct. 18, 2021) (citation omitted); *accord Invego Auto Parts, Inc. v. Rodriguez*, 34 So. 3d 103, 104 (Fla. Dist. Ct. App. 2010). The undisputed facts demonstrate all three elements were met, and Kalonymus was entitled to specific performance and damages resulting from the breach. *Wiborg v. Eisenberg*, 671 So. 2d 832 (Fla. Dist. Ct. App. 1996).

Heavily relying on this Court's decision in *M&M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1337 (11th Cir. 2020), Appellants assert that Kalonymus failed to prove it was willing and able to perform under the terms of the Agreement. Brief at 36-44.[5] This argument fails.

### A.    Kalonymus was Willing to Perform Under the Agreement.

On appeal, Appellants assert that Kalonymus was unwilling to perform under

---

[5] Appellants do not raise any issue that Kalonymus was not "ready" to perform, thereby waiving that argument. *Sapuppo*, 739 F.3d at 681.

the Agreement because "[e]ach time Kalonymus was asked to close . . .—no less than three different times in December 2021, January 2022, and February 2022—Kalonymus refused to do so." Brief at 38. This argument ignores the plain terms of the Agreement. R:1-1. First, the Agreement included a "time is of the essence" clause and provided for an October 2021 closing date, not December 2021, January 2022, or February 2022. R:1-1:17. Second, it is undisputed (and unchallenged on appeal) that *Appellants* breached the Agreement in October 2021. R:137:2. Third, Appellants do not and cannot show any term in the Agreement permitting Appellants' disregard of the contractual closing date and unilateral "modification" thereof. Under Appellants' theory, they could pick a date unilaterally for the closing and unless Kalonymus immediately agreed, Kalonymus would be "unwilling" to proceed.[6] Finally, Appellants' argument fails to acknowledge the conceded fact that each of Appellants "offers" to close failed to comply with the Agreement's requirements, including preparing documents. R:168-1:252-257.

Next, Appellants argue that Kalonymus "would only agree to close if [Appellants] first agreed to significantly reduce the purchase price." Brief at 38.[7]

---

[6] As Zeff testified, the dates provided by Appellants did not provide sufficient "time to do updated reports or anything . . . and without addressing any of the damages or the lawsuit that [Kalonymus] had filed—or the default." R:168-1:54.

[7] Zeff testified that he tried to calculate the damages after Appellants breached in October 2021, and that was the basis for the required price reductions. R:168-1:51. In sending these communications, Zeff testified that he sought to "convey to

Kalonymus' cause of action for breach of contract accrued at the time Appellants breached by failing to close in October of 2021. *Trinity Quadrille, LLC v. Opera Place, LLC*, 42 So. 3d 884, 886-87 (Fla. Dist. Ct. App. 2010). Further, the Agreement expressly permitted Kalonymus to seek specific performance and damages (R:1-1:20), as does the law. *Wiborg*, 671 So. 2d at 834-35; *Quantum Comms. Corp. v. Star Broadcasting, Inc*., 491 F. Supp. 2d 1123, 1137 (S.D. Fla. 2007).

The evidence also shows Kalonymus was "ready, willing and able to close, but only after [Appellants] satisfactorily address[ed] [Kalonymus'] demand as set forth in its November 12, 2021 letter." R:168-1:104. Specifically, Zeff testified that Kalonymus was willing to close but Appellants needed to "address[] the risks that we were then taking on – there would have been a cost to it – to proceed without updating the reports, to proceed without a loan" so "from a business perspective, we could have negotiated a resolution that would have been satisfactory," but Appellants failed to address "the breach of reps and warranties, [] damages [and] default." R:168-1:100-101. Zeff expressly stated he "would not" close in January 2022 because "none of [our concerns were] ever addressed." *Id*. The district court found this—coupled with Appellants' failure to prepare the required documents in

---

[Appellants] that [Kalonymus was] damaged, and, ultimately with the goal of coming to a business resolution for the deal." R:168-1:52.

order for *Appellants to be ready, willing and able* to close—to be "not in compliance with the terms of the Agreement." R:162:3.

The undisputed facts are clear: Kalonymus was willing to perform *according to the terms of the Agreement*, it was *Appellants* that breached the Agreement, and once that breach occurred, Kalonymus relied on the relief *provided in the Agreement* to seek specific performance and damages. There is no support for Appellants' argument that Kalonymus' unwillingness to allow Appellants to unilaterally alter the Agreement and deny Kalonymus its rights, was a lack of willingness to perform.

**B.    Kalonymus Was Able to Perform Under the Agreement.**

**1.    Appellants waived argument that Kalonymus was not "ready and able" to close.**

When addressing a specific performance claim, the trial court must evaluate whether plaintiff has shown it is ready and able to close. *M&M Realty Partners*, 982 F.3d at 1337. Kalonymus sought summary judgment on its claims (including specific performance), and while Appellants responded, they failed to argue Kalonymus was not ready or was unable to perform. *See* R:137; R:84. Instead, Appellants recognized that Kalonymus asserted it was "ready, willing and able to perform its obligations." R:84:6.

On summary judgment, Appellants' arguments were tied to the amount of damages to which Kalonymus was entitled, an issue the district court decided after the bench trial. R:84:10. Their summary judgment response was clear: while

Appellants argued Kalonymus was not entitled to specific performance for several reasons, *none* of their arguments were that Kalonymus was not ready and able to perform under the Agreement. Moreover, in Appellants' Motion, Appellants failed to raise this issue. R:36. Accordingly, any issue as to Kalonymus' readiness and ability to perform was waived. *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).

The district court recognized Appellants' belated attempt to raise the issue after summary judgment had already been granted as to specific performance and damages.[8] R:168-2:54; R:137:5-11. Specifically, the court stated it "already granted summary judgment" and "[Kalonymus] was entitled to specific performance," which was "not a disputed fact." R:168-2:54. While Appellants' counsel "respectfully disagreed," the court stated, "[s]o now, all of a sudden, for the first time, you're saying they didn't really have it" and that "now, for the first time, you're saying, '. . . no. They never had financing.'" R:168-2:56. The court continued:

> It's one thing to argue that it wasn't Kalonymus that was obtaining the financing. That's consistent with what you've always said, that the damages go to other entities that are not Kalonymus. But to say now Kalonymus did not have the ability to close, *that's never been said before.*

---

[8] The only issue not decided at summary judgment was the amount of damages, as to which a bench trial was held. R:137:12-16.

R:168-2:56-57 (emphasis added). Accordingly, Appellants waived this issue. *Road Sprinkler Fitters Local Union No. 669*, 10 F.3d at 1568.

> ## 2. *M&M Realty Partners* does not alter the district court's Order.

Throughout their Brief, Appellants place undue emphasis on *M&M Realty Partners*. There, this Court affirmed the district court's summary judgment in favor of a property seller after finding the buyer (M&M) "failed to make out a prima facie claim for specific performance or for damages for breach of contract because M&M did not provide evidence that it was ready, willing, and able to perform under the contract" as it failed to bring forth evidence that "it had the necessary funds to make the purchase." *M&M Realty Partners*, 982 F.3d at 1335. This finding was made even though M&M argued its "principals' personal resources [were] sufficient to show the company had a 'reasonable certainty' of being able to complete the purchase." *Id*. at 1337. This Court found that evidentiary basis fell "short of the 'binding commitment' the law requires." *Id*. at 1337 (citation omitted). The Court noted "[m]ere possession of funds" by the principals "does not establish that [they] had made a binding commitment . . . to lend or give those funds to M&M in order to close the deal." *Id.* at 1338.

Importantly, the Court's opinion recognizes the sale in *M&M* involved a contract that did *not* have a time-is-of-the-essence clause (as here); instead, the case involved a six-year contingency period, and there were questions regarding M&M's

38

permits and approvals, failure to file progress reports, a deficiency notice, and failure to complete certain contingencies. *Id*. at 1335-36. No such impediments were presented in this case, as Appellants have not even challenged whether Kalonymus was ready to close.

Appellants also attempt to equate the layered corporate structure present in *M&M Realty Partners* to that in this case. Brief at 41-44. This ignores the evidence and testimony below, which amply supports the Omnibus Order and Final Judgment. Instead, as set forth in *Perper v. Edell*, 35 So. 2d 387 (Fla. 1948)—which remains good law, as recognized by this Court in *M&M Realty Partners*, 982 So. 3d at 1338—"a purchaser need not be 'standing outside of the office door with all the cash in hand' but should be considered financially able if it can 'command the necessary money to close the deal on reasonable notice.'" *M&M Realty Partners*, 982 F.3d at 1338 (citing *Perper*, 35 So. 2d at 391). Zeff's testimony at trial unequivocally supports the district court's finding that he, on Kalonymus' behalf, could and did command the necessary money to close the deal on reasonable notice. Accordingly, unlike in *M&M Realty Partners*, the evidence and testimony supported entry of summary judgment in Kalonymus' favor.

### 3. The evidence supports that Kalonymus had the ability to pay the purchase price.

Appellants also argue "[t]he record contains no evidence whatsoever that Kalonymus, the only plaintiff and contracting party with the Sellers, ever had the

financial ability to pay the purchase price under the [Agreement]." Brief at 41 (emphasis omitted). Relying on *M&M Realty Partners*, 982 F. 3d at 1337, Appellants assert there is no evidence that Kalonymus had "(1) $5,450,000 in cash, (2) assets and a credit rating sufficient to command that sum, or (3) a binding commitment from a financially able third party to provide the funds." Brief at 41-42.[9] The record demonstrates otherwise.

Zeff testified at trial that he owned 100% of Kalonymus and Kalonymus was ready and able to pay for the Property "50 percent debt and 50 percent in cash." R:168-1:45, 68, 81. Regarding debt or financing, as the district court found, "Kalonymus had made arrangements to finance 50% of the purchase cost of the property through a company named Newmark" and "[t]his loan was packaged with loans for the acquisition of three other properties, by three other entities, amounting to a total loan amount of over $13 million, of which only about $2.5 million was

---

[9] Appellants complain, in an offhand manner, that the district court "concluded the purchase price was $5,150,000 because at trial, Kalonymus introduced evidence of an [a]mendment to the [Agreement] that purported to change the purchase price from $5,450,000 to $5,150,000." Brief at 42 n.24. Appellants do not properly raise this as an issue on appeal, thereby waiving the argument. *E.g.*, *Sapuppo*, 739 F.3d at 681. Nevertheless, Van Peborgh testified the purchase price amendment was "signed by Mr. Marmol on behalf of himself and Best Peacock Inn, LLC," and while it was not signed by him, Van Peborgh conceded Marmol "must have told [him] or he must have asked me for that reduction of price" and Van Peborgh testified that he agreed to it. R:168-1:271-272.

attributable to the best Peacock deal." R:162:4.[10] Zeff explained he and his counsel had negotiated the terms of the loan and structured the debt to pay for the Property. R:168-1:46.

While Appellants concede there was evidence that Newmark had committed to "part of the purchase price ($2,539,000)," they argue that "evidence is insufficient to satisfy Kalonymus' burden under Florida law, and under [*M&M Realty Partners*]." Brief at 43. First, the undisputed evidence demonstrated Newmark did finance the other properties that were to close under the same financing as the Property. R:83-8:2; R:83-9:1-9. Second, the undisputed evidence showed Kalonymus had made arrangements for financing with Newmark. R:162:4; R:168-1:46. Third, the Newmark loan agreement letter references "Kalonymus Credit Facility" on the bottom of each page. R:159. Finally, Zeff testified that Gregory Densen, the person signing the loan agreement with Newmark, represented Zeff, Zeff's father, and Kalonymus. R:168-1:83.

As to the cash payment, Zeff testified "[a] small portion of the cash was going to come from Kalonymus, but the large majority was going to come from another entity." R:168-1:45. Appellants failed to present any testimony—not speculation, but actual testimony—at trial contradicting Zeff's testimony and the record.

---

[10] One of these properties also involved Appellants as the seller to Zeff.

The district court recognized this:

> I'm looking at my notes of Mr. Zeff's testimony. It said that 50 percent debt and 50 percent cash was to be utilized. A small portion of the cash was from Kalonymus, but the vast majority was from another entity. The other single-purpose entity was going to obtain financing after the closing, and an assignment would have been executed. So nobody contested that. This is kind of like a, "Gotcha." You didn't cross-examine him about that. You didn't ever make an issue that they didn't have the cash. So he testified to that, and it was not refuted.

R:168-2:55. The district court also relied on Zeff's testimony, which was presented "without contradiction that he had cash coming from himself and other entities."

R:168-2:58. Accordingly, the record is clear that Kalonymus was able to close.

## II. KALONYMUS COMPLIED WITH SECTION 8.2 OF THE AGREEMENT AND FLORIDA LAW.

Section 8.2 of the Agreement provides:

> In the event of a default by Seller under the terms of this Agreement, Buyer shall have the sole and exclusive remedies of either (i) terminating this Agreement and receiving the return of its Deposit, whereupon all parties hereto shall be released and relieved from any and all further liability or obligations hereunder; or (ii) proceeding to enforce this Agreement by an action for specific performance, as Buyer shall thereby, without waiving Buyer's right to recover any and all losses, damages, costs and expenses resulting from Seller's default.

R:1-1:20. Accordingly, once Appellants breached the Agreement, Kalonymus was entitled to bring its action for specific performance and recover its damages that resulted from Appellants' breach. *Id*.

Appellants argue that because Kalonymus filed "an action for specific performance," Kalonymus was "obligated to perform . . . by closing and paying the

42

agreed to purchase price" based on Appellants' unilaterally setting the closing. Brief at 45. The Agreement and applicable law do not support Appellants' construction of Section 8.2.

The district court recognized this and found Appellants' "contention that [Kalonymus] is in breach of the Agreement because it is preventing [Appellants] from now performing is misplaced." R:137:5. "[Appellants] appear to equate, on the one hand, [Kalonymus'] quest for specific performance through court intervention, with, on the other, [Kalonymus] having chosen to proceed with the [Agreement], despite [Appellants'] breach, as if waiving the default." R:137:6. Finding this position to be "unavailing," the district court explained that "seeking court intervention manifests the very opposite of a 'conclusive choice' to excuse the other party's default," such that "there is no way the [c]ourt could conclude that [Kalonymus] itself then committed its own material breach." R:137:7 (citing *GPDEV, LLC v. Team Sys. Int'l, LLC*, 4:18CV442-RH-MAF, 2021 WL 8015621 (N.D. Fla. Feb. 22, 2021)).

Appellants' reliance on *GPDEV, LLC*, is misplaced. R:137:6-7; Brief at 46-47. In *GPDEV*, the defendant argued plaintiffs failed to comply with specific requirements of the parties' contract. 2021 WL 8015621, at *2-3. The district court rejected the defendant's assertion as the record evidence established that defendant urged plaintiff to nonetheless carry on and find other water suppliers to meet the

shortfall. *Id.* at *3. Thus, by moving forward with the contract, the defendant waived its right to rely on the plaintiffs' default as a basis to avoid its own performance. *Id.* Here, as the district court found, "there is no record evidence that [Kalonymus]," ever "continu[ed] to perform or accept[ed] performance under the contract and receiv[ed] the benefit of it." R:137:6-7. "[T]o the contrary, as [Appellants] themselves point out, [Kalonymus] repeatedly refused [Appellants'] efforts to proceed with closing on the transaction." R:137:7.

Similarly, *Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II*, 329 F.3d 809 (11th Cir. 2003), does not support Appellants' argument. R:137:6; Brief at 46-47. In *Merrill Stevens Dry Dock Co.*, a shipping company sought to avoid paying pre-judgment interest it owed to a shipyard for repairs asserting that the shipyard's negligence damaged the ship, thus amounting to a breach of the parties' contract. 329 F.3d at 816. The Court disagreed and found that because the shipping company chose to continue to rely on the shipyard—even after the damage occurred—to complete the repairs required under the contract, the shipping company was bound by the contract's terms. *Id*. at 816-17. Here, as the district court found "there is no indication . . . [Kalonymus] sought to proceed with the contract, waiving [Appellants'] default," and Appellants' "insistence to the contrary . . . is unsupported." R:137:6. Instead, Kalonymus was consistent and clear "that it would only proceed with the closing if [Appellants] compensated [Kalonymus] for

[Appellants'] default." *Id*. "This is not the same as, in *Merrill*, the non-breaching party's decision to move forward with the contract, without complaint, despite the other party's purported default." *Id*.

## III.    THE DISTRICT COURT CORRECTLY FOUND KALONYMUS WAS ENTITLED TO JUDGMENT AND DAMAGES.

### A.    The Record Evidence Supports the Award of Damages.

#### 1.    Kalonymus established it suffered damages.

The district court found: (i) Appellants "do not dispute that *some* entities or individuals may have suffered these loses as a result of [Appellants'] breach"; (ii) "Zeff's testimony established that even though he had planned to assign his right to purchase the [P]roperty to the Poinciana SPE's, he was not obligated to do so"; (iii) "Habibi made clear that although many of the additional payments would actually be made in the future by the entity which receives the assignment from Kalonymus, the value of Kalonymus's interest [was] diminished to the same degree because the value of its right to purchase is diminished"; (iv) "Kalonymus never assigned its rights in the Agreement to the SPE's" and "[t]herefore, the benefit of the bargain that was struck in the Agreement belonged to Kalonymus and not any other entity"; and (v) accordingly, "Kalonymus [was] entitled to an award of damages in order to receive the benefit of the bargain had the [Appellants] not breached the Agreement and had the parties closed in October of 2021." R:162:5-6. Ignoring these findings, and the testimony at trial, Appellants argue "there is no

record evidence that Kalonymus suffered 'a single dime' in damages" as it was not to be the actual buyer had the Property sale closed in October 2021. Brief at 49 (citation omitted).[11] The record and law establish otherwise, as the district court determined. R:137:8 ("the Court also finds [Appellants'] arguments as to the assignment legally, factually, and conceptually infirm as well.").

The district court recognized Appellants provide "no legal authority for their supposition that the documentary evidence they rely on would suffice to support their claim that [Kalonymus] assigned all its rights under the parties' Agreement, including the right to file suit and collect damages," to other entities. R:137:8. Accordingly, the district court stated that it was "unwilling to pass on [Appellants'] bare conclusory argument that [Kalonymus] assigned away any right it had to, at a minimum, litigate this case or recover damages." R:137:9. This conclusion makes sense, as the evidence establishes Kalonymus retained all rights and suffered all damages.

Kalonymus was a party to the Agreement as the buyer, paid the earnest money deposit, and had planned to pay a portion of the sale price. R:168-1:45, 89. It also is undisputed that there never was an assignment from Kalonymus to any SPE, as that

---

[11] The district court found this argument to be undermined by the fact that Kalonymus was open about this arrangement and that Appellants' "sudden concern" did not occur until after Kalonymus filed its lawsuit R:137:8.

assignment was contingent upon the closing of the transaction. R:137:7. Finally, it is undisputed that as of October 2021—and even January 2022—Kalonymus contractually remained the "buyer." R:168-1:50, 51.

The issue of who was the damaged party was addressed by Habibi, *i.e.*, "[h]ow do you calculate the damage to Kalonymus" if they were going to assign it to another entity. R:168-1:161. Habibi explained "the right to the ownership had a lot more value," such that Kalonymus was "entitled to the benefit of the bargain that [it] negotiated in that first transaction." R:168-1:163. This is because by breaching the Agreement with Kalonymus, Appellants "damaged" the "ownership rights of the [P]roperty," and "that's really what the economic consequence here speaks to." *Id*. "[T]he right to the ownership had a lot more value [in October 2021], because the residual cash flows after an arm's-length lender and arm's-length equity investor . . . would['ve] provide[d] him some benefit." R:168-1:163. Now, "because any arm's-length investor or lender would require more money, there's less residual cash flow available to whomever wrote the offer. So that's really where the damages come[] from." *Id*.[12] Ultimately, as Habibi testified, "it's really Kalonymus that's affected, because it is the entity with the opportunity to bring in that investor" and by

---

[12] Appellants' argument completely ignores Habibi's testimony at trial. R:168-1:163-175; *see* R:168-1:165 ("to understand the entire cost of damages, one needs to consider the entire ownership structure of the investment").

Appellants' breaching the Agreement, that "right . . . is now diminished." R:168-1:203-204.

Appellants' assumptions and speculations about what may have occurred had Appellants not breached the Agreement in October 2021 do not change the undisputed facts, and the district court was correct in finding that Kalonymus was the party entitled to damages. R:137:10-11.[13] This is because no other "entity []ever invested in the subject property" and "[t]hat's [the] whole point." R:168-1:204. Ultimately, there is no dispute over three dispositive facts: (i) Kalonymus was the buyer, as set forth in the Agreement; (ii) at no point prior to October 2021 did Kalonymus ever assign or transfer its interest; and (iii) Appellants conceded that "some" damages were suffered as a result of their breach. R:162:4; 168-1:45, 50-51, 89, 119, 224; R:137:10. Combine these undisputed facts with Zeff and Habibi's testimony and the district court's finding that "the value of Kalonymus's interest is diminished to the same degree because the value of its rights to purchase is

_____

[13] Appellants' statement that, "Kalonymus was awarded $1,313,350 without a single piece of evidence showing any loss or harm to Kalonymus amounting to $1,313,350" (Brief at 50 n.29), ignores Habibi's testimony at trial. *See* R:159-14; R:159-15. This statement also ignores Zeff's testimony as to the damages Kalonymus suffered. R:168-1:54-58.

Nevertheless, and again, "arguments" made in footnotes are not developed issues for this Court's review. *E.g.*, *Sapuppo*, 739 F.3d at 681.

diminished" (R:162:5), the competent, substantial evidence establishes that Kalonymus was the party that suffered and was entitled to recovery of damages.

> **2.     The district court applied relevant corporate law on legal separateness.**

Appellant argues the district court erred when "it ignored the separate legal personalities between Kalonymus and the other individuals and entities whose purported damages it claims as its own." Brief at 51-52.[14] This statement is contradicted by the actual record. While the district court and Kalonymus recognized there were "other individuals and entities involved in Kalonymus' side of the transaction," it is also undisputed that at no point between Appellants' breach and the entry of the Verdict did Kalonymus execute any assignment from Kalonymus to *any other entity*. R:162:3-4. Equally clear from the record, Habibi did not "bundle[] together the alleged damages that would be suffered by multiple third parties and call them Kalonymus' damages" (Brief at 50), but instead testified (as the district court found) it was "the value of Kalonymus's interest" that "diminished to the same degree because the value of its rights to purchase is diminished." R:162:5. Appellants' recitation of the law as to "separate legal personalit[ies]" does not change this result. Brief at 51. Nor does Appellants' continued speculation as to what

---

[14] Contrary to Appellants' representation, at no point during the trial did Habibi "concede" that he "willfully ignore[ed] a series of fundamental principles of corporate law." Brief at 50.

would have occurred had they not breached the Agreement. Instead, as it was required to do, the district court correctly relied on the factual evidence and Habibi's testimony to find the damages incurred was by Kalonymus—the party to the Agreement on the day of the breach and the day this case went to trial.

### 3.    Appellants' reliance on *Farman* does not change this result.

Appellants' last point of this argument is an extensive quotation of the *Farman* decision and conclusionary sentence that Kalonymus failed to prove it suffered damages. Brief at 52-53. Both Habibi and Zeff's testimony supports the district court's conclusion that Kalonymus suffered damages as its "value" "diminished to the same degree because the value of its rights to purchase is diminished." R:162:5. Unlike in *Farman*, where the court found that there was "no testimony" to support the damages award, *Farman v. Deutsche Bank Nat. Tr. Co., as Tr. for Long Beach Mort. Loan Tr. 2006-05*, 311 So. 3d 191, 195-96 (Fla. Dist. Ct. App. 2020), here, the district court was clear as to the testimony upon which it relied. R:162:5.

### B.    The District Court Correctly Placed Kalonymus in the Position It Would Have Been in Had Appellants Not Breached the Agreement.

The law is well-established that an "injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract." *Mid-Continent Cas. Co. v. Adams Homes of Nw. Fla. Inc*, 809 F. App'x 719, 722 (11th Cir. 2020) (citation omitted). Appellants do not dispute this. Brief at 53-55. Instead, Appellants assert

that the district court put Kalonymus "in a much better position" than it would have been had Appellants not breached the Agreement. Brief at 54-55. This argument relies on the flawed premise that Kalonymus could not be damaged as it would not have been the party to close on the Property in October 2021. Brief at 54-55.

The district court was not "persuaded by [Appellants'] alternative argument" because if Appellants "had not breached the Agreement, [Kalonymus] would have taken possession of Best Peacock in October 2021, when various conditions pertaining to that ownership were, according to the record, more favorable than they are now," and it is "[b]ecause the closing never happened, [that] Kalonymus was unable to make the contemplated assignment of Best Peacock." R:137:10. Accordingly, "[i]n litigating this breach-of-contract case, [Kalonymus sought] exactly what [Appellants] themselves say the law allows: specific performance and to recover any damages that, together, [] put [Kalonymus] in the same position it would have been in had the contract proceeded with closing in October 2021, exactly as required by the parties' Agreement." R:137:10-11.

This finding is completely supported by the undisputed facts that: (i) Kalonymus was the buyer, as set forth in the Agreement; (ii) at no point prior to October 2021 did Kalonymus ever assign or transfer its interest in the Agreement; and (iii) Appellants conceded that "some" damages were suffered as a result of their breach. R:162:4; R:168-1:45, 50-51, 89, 119, 224; R:137:10. Based on these facts,

Kalonymus was the injured party and entitled to the damages awarded by the district court.

## IV. APPELLANTS FAILED TO PROVE KALONYMUS' DAMAGES SHOULD BE REDUCED UNDER THE DOCTRINE OF AVOIDABLE CONSEQUENCES.

The district court correctly found that Appellants fell "short of establishing that Kalonymus failed to mitigate its damages." R:162:6.[15] Under the doctrine of avoidable consequences, while there is no "duty to mitigate," that same party cannot recover "damages inflicted by a wrongdoer that the injured party could have reasonably avoided." Fla. Civ. Prac. Damages § 2.43, at 2–30 (6th ed. 2005). But this doctrine does not require Kalonymus to undergo "Herculean efforts" to avoid a damages reduction; instead, "the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through 'ordinary and reasonable care,' without requiring undue effort or expense." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009). Florida courts have stated the injured party is not required to undertake effort or expense that would subject it to "undue risk, burden or humiliation." *Id*. (citation and emphasis omitted). Here, the record is clear that Appellants failed to meet their

---

[15] If anything, Appellants could have avoided the consequences of their failure to close in October 2021, when their lender offered to permit them to pay off the mortgage early by paying the capital gains tax, but Appellants chose not to, causing this entire litigation. R:162:3.

burden of proof that Kalonymus could have reasonably avoided the consequences—without incurring undue risk, burden, or humiliation—of Appellants' breach of the Agreement. *Hollister Inc. v. Zassi Holdings, Inc*., No. 20-10636, 2021 WL 5984983, at *3 (11th Cir. Dec. 16, 2021); *see also* R:137:9 ("the [c]ourt sees no way around laying the burden of establishing the assignment at the feet of [Appellants]").

Appellants argue that "Kalonymus could have avoided the majority of its claimed damages simply by closing in January 2022 when [Appellants] offered to do so," asserting that the damages would have been "no more than $417,186." Brief at 66. This statement ignores the risk and burden that the evidence established Kalonymus would have been required to undertake—and which the law does not require it to have taken on—to avoid damages.

At trial, Zeff testified that market changes between October 2021 and January 2022 "create[d] a volatile investment environment where the cost of capital was increasing," such that "the types of returns and the amount of return an investor was demanding for their cash was higher because of the environment." R:168-1:54-55. In January 2022, the "market was getting shaky" as "[p]eople didn't know what was going to happen" and "there was just a lot of uncertainty in the market" "compared to the environment over the summer until October [2021], where it was a little more stable." R:168-1:57.

Zeff testified that to close in January 2022, without any changes to the terms of the Agreement, "there would have been a cost to it – to proceed without updating the reports, to proceed without a loan" and that it would have taken Kalonymus "60 days to go do these new reports and see if we could get a new loan." R:168-1:100; R:168-1:59. Kalonymus wanted to finance as "debt is generally a lower risk category than equity." R:168-1:56.[16] This is especially so considering that Appellants had failed to address "the breach of reps and warranties, or damages or default." R:168-1:101.

Moreover, Zeff explained he secured financing for the October 2021 closing that was "packaged up in a credit facility with other properties," such that it would be "cross-collateralized," providing more favorable loan terms. R:168-1:169. Without such a package, there was more risk and burden to Kalonymus, and "the deal" in January 2022 was not "as favorable to Kalonymus as it was in October of 2021." R:168-1:57.[17]

---

[16] At trial, Habibi testified that "if there were no debt and the property were paid for all cash, because the spread in costs of equity is even greater than the spread in the cost of debt across the two scenarios, the damages number would actually go up to . . . 2,471,755, so it's an increase of $125,117 if it were an all-cash deal." R:168-1:165-166.

[17] That Appellants "wanted" a cash deal is of no matter as Appellants and their real estate attorney each conceded nothing in the Agreement prohibited financing. R:168-1:235, 239, 260.

Appellants also do not dispute they "never made any specific offer to pay for Kalonymus' damages prior to their proposed closing dates in January and February 2022." Brief at 56; R:162:6; R:168-1:235-236, 267-269. Instead, Appellants argue they were not "required to make a 'specific offer' to settle Kalonymus' damages claim for Kalonymus to close," relying on Section 8.2. Brief at 57. But this misses the point. Section 8.2 provides Kalonymus was entitled to specific performance and to recover its "losses, damages, costs and expenses" because of Appellants' failure to close. R:1-1:20. As there is no evidentiary or legal basis that Kalonymus failed to mitigate its damages, the district court's Final Judgment should be affirmed.

## CONCLUSION

Kalonymus respectfully requests this Court affirm the Final Judgment.

Respectfully submitted,

By: */s/ Brigid F. Cech Samole*

| | |
|---|---|
| Katherine M. Clemente | Brigid F. Cech Samole |
| GREENBERG TRAURIG, LLP | Barry L. Rothberg |
| One Vanderbilt Avenue | Robert S. Galbo |
| New York, New York 10017 | GREENBERG TRAURIG, P.A. |
| Telephone: 212.801.9200 | 333 S.E. Second Avenue, Suite 4400 |
| clementek@gtlaw.com | Miami, Florida 33131 |
| miamiappellateservice@gtlaw.com | Telephone: 305.579.0500 |
| | cechsamoleb@gtlaw.com |
| | rothbergb@gtlaw.com |
| | galbor@gtlaw.com |
| | miamiappellateservice@gtlaw.com |

*Counsel for Defendant-Appellee, Kalonymus Development Partners, LLC*

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the length limit of Fed. R. App. P. Rule 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,947 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2010 in Times New Roman, 14-point font.

/s/ *Brigid F. Cech Samole*
Brigid F. Cech Samole

**CERTIFICATE OF SERVICE**

I certify that on May 20, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Brigid F. Cech Samole*
Brigid F. Cech Samole